DA 06-0511

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 160

VINCE and DEBBIE ARKELL,

        Petitioners and Respondents,

   v.

MIDDLE COTTONWOOD BOARD OF
ZONING ADJUSTMENT,

        Respondent and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV-04-482
Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Arthur V. Wittich and Frederick P. Landers, Jr.,
Wittich Law Firm, P.C., Bozeman, Montana

        For Respondent:

                Susan B. Swimley, Attorney at Law, Bozeman, Montana

Submitted on Briefs:  June 6, 2007

Decided:  July 10, 2007

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    Vince and Debbie Arkell purchased a lot and house in the Middle Cottonwood Zoning District in Gallatin County. A couple of years later, upon learning that an after-the-fact variance was needed for an addition they had constructed, the Arkells applied for a variance. Their application was denied by the County Planning Director. The Arkells then appealed to the Middle Cottonwood Board of Adjustment. After a hearing, the Board denied the motion for lack of a majority. The Arkells then appealed the Board's denial to the District Court. The court ordered a referee to conduct a hearing and take additional evidence. The referee concluded that the variance should be granted. The District Court adopted the referee's findings of fact and conclusions of law and granted the Arkells' requested variance. The Board appeals the decision, and we affirm.

¶2    We restate the issue on appeal as:

¶3    Did the District Court abuse its discretion by overturning the Board and granting the Arkells' application for a zoning variance?

## BACKGROUND

¶4    The property at issue is located at 7500 Saddle Mountain Road within the Middle Cottonwood Zoning District. The zoning regulations for the District include a 125-foot setback requirement from the centerline of Saddle Mountain Road. The house in question was originally constructed by Michael Thacker prior to adoption of the zoning regulations. The house, as originally constructed, was non-conforming to the later adopted zoning regulations as it was built 113 feet 9 inches from the centerline of Saddle Mountain Road.

2

¶5    The house, as originally constructed, was a box-like building providing storage for recreational vehicles on the main floor, including large roll up garage doors, and living quarters on the second floor.  On the east side of the main floor was a mudroom and an attached storage area with a dirt floor about half the size of the main house.  On the west side of the house was a septic tank and drain field.  On the south side of the house was, according to the Arkells' testimony, a sanitary sewer cleanout stud and corresponding sewer line.

¶6    In the spring of 2001, Bill Slingsby purchased the property after an arson fire gutted a portion of the main floor.  Prior to remodeling, Slingsby contacted the Gallatin County Planning Department to ask if any permits were necessary.  The Department informed him that no permit was necessary.  The Department did not inform Slingsby that he was in a zoning district.  However, Slingsby did not specifically ask if he was in a zoning district.  Slingsby substantially completed remodeling the house and then sold it to the Arkells in September of 2001.  When purchased, the second story of the house was accessed by a narrow (three feet wide) indoor stairwell and a stairwell attached to the outside westerly wall.

¶7    In October of 2001, Vince Arkell constructed an arched area addition onto the north, street-facing side of the house extending the main and upper floors.  The maximum depth of the arched area is 14 feet.  Consequently, the house is now 99 feet and 9 inches from the centerline of Saddle Mountain Road.   Slingsby testified that he did not know the property was in a zoning district when he sold it to the Arkells.  The Arkells testified

that when they purchased the property and added the arched area to the north side they did not know the property was in a zoning district.

¶8 Because the addition increased the extent of the setback non-conformance by 14 feet, a zoning variance was needed. On January 30, 2004, after the Arkells became aware of the zoning district and corresponding setback requirements, they applied for a variance to approve the non-conforming addition. On May 25, 2004, the Gallatin County Planning Director denied the variance application.

¶9 The Arkells then appealed to the Middle Cottonwood Board of Adjustment. A hearing was held July 21, 2004, with four out of the five Board members present. Debbie Arkell testified as to her ignorance of the zoning regulations when the addition was constructed and to the hardship involved with building in any direction but toward the road. The Arkells' neighbor, Anson Crutcher, then testified against granting the variance. Crutcher, while admitting that the addition "looks better," asserted that Debbie had admitted to him that she knew of the zoning regulations before they constructed the addition. Another neighbor, Robert Swanekamp testified, briefly, that the unnecessary hardship requirement was not met because the Arkells could have added on to the east side of the house over the storage room with a dirt floor.

¶10 The Board then debated the matter, with three of the four members admitting that the house "looks so much better" with the addition. Two of the members, however, were concerned that the claimed hardship was induced by the action of the Arkells when they constructed the addition without seeking a permit or variance, and therefore the unnecessary hardship requirement had not been met. The four members eventually voted

4

on a motion to reverse the Planning Director's variance denial. The result was a tie: two for and two against. However, the concurring vote of three Board members was necessary to reverse the Planning Director's denial. *See* § 76-2-224, MCA, and Section 11.3(g) of the Zoning Regulation. Consequently, the motion failed for lack of majority. Because of the tie vote, the Board did not issue findings of fact. The Board then issued a letter of decision officially denying the Arkells' appeal.

¶11 On August 25, 2004, the Arkells appealed the Board's decision to the District Court and requested a writ of certiorari, as specified in § 76-2-227, MCA. The court, pursuant to § 76-2-227(3), MCA, appointed a referee to take additional evidence. On January 20, 2006, a hearing was held before the referee. The referee heard testimony from Bill Slingsby, the contractor who sold the property to the Arkells. Both Debbie and Vince testified. Subsequently, Anson Crutcher testified for the Board, and the Arkells called Tim Roark, the Gallatin County Environmental Health Director, in rebuttal. Additionally, the full record from the Board proceeding, including a transcript of the hearing, was included in the record and the referee personally viewed the property.

¶12 On March 27, 2006, the referee submitted his proposed findings of fact and conclusions of law. The referee determined that the variance is not injurious to public health because the 14-foot addition does not pose any danger to the traveling public. Additionally, he determined that the variance does not impair the intent of the Zoning Regulation because it does not significantly alter the density of the property and improved the look of the property. Finally, the referee determined that the house had suffered extensive fire damage; that the configuration of the house was unusual when

purchased by the Arkells, in that the main living area was on the second story; that the only direction to expand was north because the storage area was to the east, with the sewer line and septic tank and fields to the south and west; and, further, that the need to accommodate Debbie Arkell's sister, who at the time the addition was built lived with the Arkells and suffered from post-polio syndrome, was legitimate. The referee therefore concluded that the requirements of Section 11.3 were met and recommended that the requested variance be granted. The District Court subsequently adopted the referee's findings and conclusions and granted the variance request.

¶13 The Board now appeals the District Court's order reversing the Board's denial and granting the variance.

## STANDARD OF REVIEW

¶14 We review a district court's decision to grant a variance, where the court exercises its statutory option to take additional evidence, for an abuse of discretion and to determine whether that decision is supported by substantial evidence. *Petition of Sutey Oil Co. v. County Planning Bd.*, 1998 MT 127, ¶ 13, 289 Mont. 99, ¶ 13, 959 P.2d 496, ¶ 13 (citations omitted).

## DISCUSSION

¶15 **Did the District Court abuse its discretion by overturning the Board and granting the Arkells' application for a zoning variance?**

¶16 The Board argues that the District Court abused its discretion and that the criteria for the grant of a variance have not been met. Section 11.3 of the Zoning Regulation prescribes the necessary criteria for the grant of a variance, "each and every one" of

6

which must be met. Specifically, the Board contends that Sections 11.3(a), (c) and (e) have not been met.

¶17 Section 11.3(a) requires that the variance not be injurious to the public health, safety and general welfare of the community. Section 11.3(c) requires that the variance not impair the intent or purpose of the Zoning Regulation. Finally, no variance may be granted unless the applicant would suffer "unnecessary hardship" if the variance were not granted, as defined at Section 11.3(e).

¶18 Before we consider whether the District Court abused it discretion by concluding that these requirements were met, we must decide two preliminary issues. First, the Arkells argue that the Board does not have standing to contest the decision of the District Court. Second, the Board argues that the District Court applied the wrong standard when it reviewed the Board's denial of the variance.

¶19 A. Does the Board have standing to appeal?

¶20 The Arkells again argue, as they did in their motion to dismiss the appeal, that the Board lacks standing because the Board, as a quasi-judicial body, is not an aggrieved party. Additionally, the Arkells contend that this action is precluded by § 7-1-201(4), MCA, which states: "[a]dministrative boards . . . may not sue or be sued independently of the local government unless authorized by state law."

¶21 As we discussed in our order denying the motion to dismiss, § 76-2-227, MCA, specifically provides for district court review of a decision of a board of adjustment not by direct appeal, but by writ of certiorari. The writ is directed to the board of adjustment, thus making it a party to the litigation. Section 27-25-205, MCA. Finally, we note that

7

the Arkells' petition named the Board as the opposing party. Therefore, the Board has standing to appeal the District Court's order reversing its decision.

¶22    B. Did the District Court apply the wrong standard of review?

¶23    The Board argues that the District Court undertook a *de novo* review of the Board's decision, as opposed to reviewing the decision to determine whether the Board abused its discretion, and that this improper review constitutes reversible error.

¶24    Section 76-2-227, MCA, authorizes the reviewing court to hold a hearing and reverse, affirm, or modify a decision made by a board of adjustment. A district court is thus bound to review a board of adjustment's decision for an abuse of discretion. *Sutey Oil*, ¶ 12. In *Sutey Oil*, the appellant landowner argued that the District Court had utilized the wrong standard of review. Although the court in that case identified its scope of review as that traditionally available upon writ of certiorari, i.e., whether the Board acted legally and within its jurisdiction, the court actually used an abuse of discretion standard as it concluded that the Board "had sufficient information upon which to base its denial . . . ." *Sutey Oil*, ¶ 27. Therefore, we concluded that the court, while indicating an incorrect standard, actually reviewed the Board for an abuse of discretion.

¶25    Here, neither the District Court nor the referee identified the scope of its review. Nevertheless, the Board contends that the District Court actually conducted a *de novo* review by relying solely on the referee's findings and conclusions and not sufficiently deferring to the Board. What the Board is asking us to do, in effect, is limit the District Court to a court of review. Such a holding, however, would be contrary to the District Court's statutory authority to take additional evidence and issue findings and conclusions

8

under § 76-2-227(3), MCA. Further, in this case in particular, it would have been difficult for the court to have relied only upon the Board's findings, as it did not issue any. Instead, there was a tie vote on the motion to reverse the Planning Director's denial. The Arkells' appeal was therefore procedurally denied, *not* denied on the merits. Accordingly, the court properly sought additional evidence to help it determine whether there was sufficient evidence to grant the variance.

¶26 C. Did the District Court have sufficient evidence to support its determination that the variance would not be injurious to the public health, safety and general welfare and would not impair the intent or purpose of the Zoning Regulation?

¶27 The Board argues that the variance clearly would be injurious to public safety and would impair the purpose of the Regulation. The Board, on appeal, combines these two questions (whether the requirements of Sections 11.3(a) and (c) have been met) into one issue, because the Board contends that the setback requirement was intended to provide a "clear line of sight" in order to prevent traffic accidents. The Board does not contest the court's conclusion that the variance does not impair the other intents and purposes of the Zoning Regulation, such as the total size of the house and the distance from adjacent property lines.

¶28 According to the Board, the court's findings cited "[n]o evidence whatsoever" for its conclusion that the variance does not "pose any danger to the traveling public." Interestingly, the Board also fails to cite to specific evidence for its contention that the variance does in fact endanger the traveling public other than a Board member's comment that people often drive down the road at a high rate of speed. Neither party

9

introduced expert testimony concerning the requested variance and public safety at the referee hearing. Instead, the referee relied upon the pictures and diagrams of the property, his own visit to the property, and upon the numbers—the house, with the addition, was still 100 feet from the road. Additionally, the referee may have considered the fact that during the adjustment hearing a Board member admitted that the real safety concern for driver visibility is roadside landscaping, not the houses themselves.

¶29 Therefore, we conclude that, while the court may not have been presented with technical evidence, there was sufficient empirical evidence to determine that the variance is not injurious to public safety and does not impair the purpose of the Zoning Regulation.

¶30 D. Did the District Court have sufficient evidence to support its determination that the Arkells would suffer unnecessary hardship if the variance were denied?

¶31 Section 11.3(e) of the Zoning Regulation specifies that no variance "shall be granted unless the owner seeking the variance would suffer unnecessary hardship if the variance or special exception were not granted." The section defines "unnecessary hardship" as "an extraordinary and exceptional situation uniquely affecting the specific property" for which the variance is sought. Further, the hardship may not be "induced by action of the applicant for the variance."

¶32 The court concluded that the Arkells would suffer unnecessary hardship because the structure had burned; the original structure used the first floor for recreational storage; the only direction the Arkells could expand was north; and the Arkells' reason for expanding, to create additional living space for Debbie's sister, was legitimate. The

10

Board counters that the fire has no relevance because the house was substantially rebuilt within the same footprint, and that the configuration of the house, while odd, did not necessitate an addition. Further, the Board points out that the Arkells could have built to the east, over the storage structure, and could have relocated the septic tank and sewer cleanout line located to the west and south. Finally, the Board contends that any hardship has been induced by the Arkells' own action.

¶33 The unnecessary hardship at issue in this case is not the potential cost, in time and money, to the Arkells should they have to remove the addition and build on another side of the house. This would clearly be "induced" by the Arkells' act of building into the setback and therefore would not meet the hardship criteria. Instead, the hardship at issue is the need for a full living area on the ground floor to accommodate Debbie's sister. There was substantial evidence, primarily the Arkells' testimony, from which the court could conclude that the need to accommodate Debbie's sister, who suffers from post-polio syndrome and would have had difficulty climbing the narrow stairs in place at the time of the addition, is extraordinary and unique to the Arkells. Having determined that the need to expand was extraordinary and unique, we must now consider whether there was sufficient evidence that the Arkells were unable to build in any direction but north, toward the road.

¶34 The Board claims that the Arkells could have expanded toward the east, over the dirt-floored storage room. The Board points to the testimony of Slingsby, a contractor and the previous owner of the property, who opined that it is typically easier to remodel rather than to build a new addition. However, when asked on cross whether he would

"agree that [one] could have put a major addition on that house" to the east, Slingsby answered "[s]ure, anything's possible." This is hardly an affirmative statement that it would have been easier to build to the east. In fact, Slingsby consistently testified that "it depends on what you want to do with the house," as to whether expanding to the east was an option. In his opinion, "if you were going to add on a bedroom, it might be easier." However, the Arkells were not adding a bedroom but were adding living space to accommodate Debbie's sister, a project requiring more space than one bedroom. Debbie's testimony that they did not consider the storage area as part of the living space of the house, combined with the exhibits and the viewing of the house provided the referee, and hence the court, with sufficient evidence that expanding to the east was not a reasonable option.

¶35 The Board also argues that Vince testified that he could have added onto the south side without any impediment. In fact, on cross, the county attorney stated that if "regardless of expense, and regardless of aesthetics," Vince had chosen to build onto the south of the house, he "would not have increased the setback violation." The county attorney followed this statement by asking, "[c]orrect?" Vince answered in the affirmative. There are two reasons that the Board's analysis of this interaction is incorrect. First, the statement is essentially a hypothetical that assumes the Arkells, with unlimited resources, had chosen to add onto the south side of the house. Second, the statement actually ends by positing, not that the Arkells *could have* expanded to the south, but, *if* they had, there would have been no increase in the setback. Given the

12

compound nature of the question, it is likely that Vince was agreeing to the obvious—if they had built to the south, they would not have increased the setback.

¶36    The Arkells' actual testimony indicates that they did not consider expanding to the south a possibility because of the sewer cleanout and accompanying sewer line. This position was supported by the exhibits showing the house layout, including the sewer cleanout on the south side, and by the referee's personal viewing of the property. This evidence is sufficient to support the court's determination that expanding to the south was not a reasonable option.

¶37    Finally, the Board claims that the Arkells could have expanded to the west, where the septic tank and drain field are located. The Board points to the testimony of the County Health Director who stated that it is routine for property owners to obtain permits to relocate septic tanks and drain fields. Further, the Board, citing testimony given at the Board hearing that relocation would cost between $3,000 and $5,000, claims that relocation would not be cost prohibitive.

¶38    Once again, we disagree with the Board's analysis of the testimony. While the health director did state that it was not "uncommon" for property owners to apply for permits to relocate septic tanks, he also stated that state regulations require at least a 5-foot separation between a septic tank and a house and laid the foundation for a diagram showing that the house and septic tank were only 10 feet apart, illustrating that an expansion of more than 5 feet would require relocation of the septic tank. Further, the $3,000 to $5,000 figure was suggested by Anson Crutcher, the Arkells' neighbor and a vocal opponent of the variance, during his testimony before the Board. Later in the same

13

hearing a board member disputed that figure and posited that the actual cost "could end up [at] $10,000." The combination of a 5-foot separation requirement and a potential $10,000 price tag provided the court with sufficient evidence that expanding to the west was not a reasonable option.

¶39 We hold that there was sufficient evidence before the court to support its conclusion that without the variance the Arkells would suffer unique, unnecessary hardship.

## CONCLUSION

¶40 The District Court did not abuse its discretion by overturning the Board's denial and granting the variance.

/S/ W. WILLIAM LEAPHART


We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JIM RICE
/S/ JAMES C. NELSON