# FILED

January 3 2008

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 06-0173

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 1

FLATHEAD CITIZENS FOR QUALITY GROWTH, INC.,

       Plaintiff and Appellant,

  v.

FLATHEAD COUNTY BOARD OF ADJUSTMENT,

       Defendant and Appellee,

TUTVEDT FAMILY PARTNERSHIP,

       Plaintiff and Appellant,

  v.

FLATHEAD COUNTY BOARD OF ADJUSTMENT,

       Defendant and Appellee.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                In and For the County of Flathead, Cause No. DV-2005-503(A)
                Honorable Stewart E. Stadler, Presiding Judge

COUNSEL OF RECORD:

        For Appellant Flathead Citizens for Quality Growth, Inc.:

           Jack R. Tuholske, Tuholske Law Office, P.C., Missoula, Montana

        For Appellant Tutvedt Family Partnership:

           Paul A. Sandry, Johnson, Berg, McEvoy & Bostock, PLLP, Kalispell, Montana

        For Appellee:

           Jonathan B. Smith, Deputy County Attorney, Kalispell, Montana

Submitted on Briefs:  February 28, 2007

Decided:  January 3, 2008

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 On July 13, 2005, Flathead Citizens for Quality Growth, Inc. (Citizens) filed suit against the Flathead County Board of Adjustment (Board) in the Eleventh Judicial District, Flathead County. The suit challenged a decision by the Board issuing a Conditional Use Permit (CUP) to Tutvedt Family Partnership (Tuvedt). The CUP allowed Tutvedt to extract and crush gravel on a 320-acre parcel of land it owned in the West Valley area of Flathead County. Citizens argued the issuance of the CUP violated the zoning regulations of the West Valley Zoning District (District) because it permitted Tutvedt to operate a gravel crushing operation which was not accessory to normal farm operations. Subsequently, Tutvedt intervened in the suit and also challenged the Board's decision. Tutvedt, however, argued that the CUP was too narrow in scope because it prohibited Tutvedt from establishing asphalt and concrete batching operations on its land within the West Valley. The District Court ultimately granted summary judgment to the Board, denied motions for summary judgment filed by Tutvedt and Citizens, and upheld the lawfulness of the Board's decision to issue the CUP. Both Tutvedt and Citizens appealed. We affirm in part, reverse in part, and remand to the District Court for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 From September 1995 to October 1996, residents of the West Valley, an area northwest of Kalispell in Flathead County, began a major overhaul of the zoning regulations governing the District. The initial impetus for this process was a proposal to establish a neighborhood convenience store near a local school in the West Valley. The

3

residents held a series of monthly meetings in which they evaluated existing land uses, generated input about concerns and issues surrounding future land use, and ultimately developed a set of goals and a plan to guide land use and development in the District. Their efforts culminated in the West Valley Neighborhood Plan (Plan), a document which "examines the various physical, biological, and social elements of the area to establish a benchmark from which all future land use proposals can be measured. More importantly, the Plan presents a future vision for West Valley."

¶3 Initially, the West Valley was classified primarily for silvicultural and agricultural uses. But as the Plan notes, "[t]he uniform application of a single zoning district to such a large area fails to recognize the variability of land features throughout the district. Not all the land can easily be classified as either 'timber' or 'agriculture', especially when considering how the land use character of the area has changed dramatically, even with zoning in place. The liberal use of subdivision exemptions (family transfers, occasional sales) over the past 17+ years has created a suburban development pattern in many locations."

¶4 To respond to changing uses in the West Valley area, the residents formulated four land use goals, and accompanying policies, to guide the development of new zoning regulations. These goals include: (1) planning for wise use of the land in the West Valley; (2) maintaining the rural and scenic quality of the valley; (3) protecting air and water quality; and (4) protecting private property rights. The accompanying policies address the following major areas: agriculture/forestry, residential, commercial/industrial, open space, and public services. Within each policy area, the Plan makes specific

4

recommendations consistent with the four major goals. Further, the Plan recommends that subdivision and zoning regulations be utilized to practically implement these policy recommendations. "Subdivision and zoning regulations are the primary tools of plan implementation. Subdivision regulations can assess compliance of proposed land divisions with the Neighborhood Plan and zoning regulations and require mitigation measures as appropriate . . . . Land use regulations generally establish allowable uses, set minimum lot sizes, and identify performance standards for new development."

¶5 In April of 1997, the Flathead County Board of County Commissioners (Commissioners) adopted the Plan as the basis for a new set of zoning regulations governing land use in the District. The Flathead County Zoning Regulations (FCZR, or Regulations) define the District as "[a] district to promote orderly growth and development in the West Valley area consistent with the community vision statements as expressed by the text and map exhibits of the West Valley Neighborhood Plan, County Resolution #1226-A." FCZR § 3.34.010. In addition to citing directly to the Plan in its definition of the District, the Regulations also directly incorporate provisions of the Plan into the Regulations themselves. "In cases where a neighborhood plan, addendum to a Master Plan, or other adopted document contains aspects related to zoning and is under the jurisdiction of these regulations, the provisions that are more restrictive shall control." FCZR § 1.04.020.

¶6 In March 2005, Tutvedt applied to the Board for a CUP to operate a gravel pit on a 320-acre parcel of land it owned within the District. Tutvedt sought permission to extract and process gravel and sand, conduct limited retail gravel sales, use a crushing machine,

5

and operate an asphalt batch plant. Under FCZR § 2.03, the Board has the authority and responsibility to approve or deny such permits. FCZR § 2.06 outlines the process which the Board must follow when considering an application for a CUP. One of the steps in this process requires the Board to evaluate the CUP under a specific set of criteria listed at FCZR § 2.06.080. These criteria cover four major areas: Site Suitability, Appropriateness of Design, Availability of Public Services and Facilities, and Immediate Neighborhood Impact. Further, under FCZR § 2.06.090, the applicant has the burden of proof to show the criteria have been satisfied. Because Tutvedt's initial application lacked the necessary information to satisfy these criteria, the Board tabled it until Tutvedt could provide further information.

¶7     After Tutvedt supplied the required information, the Flathead County Planning and Zoning Department prepared a Staff Report (Report) which thoroughly evaluated the application. The Report provides background information on Tutvedt's proposed operation and the existing land use in the District. The Report also considers and applies the relevant Regulations and state laws to the CUP application, makes specific findings of fact, and concludes with a series of recommendations to the Board. Because the Board ultimately adopted it as the basis for its decision, aspects of the Report which bear significantly on the issues raised in this appeal must be discussed in some detail.

¶8     One significant issue which the Report addresses concerns the zoned status of the District itself. The Report begins by stating the definition of the District from the Regulations themselves. See ¶ 5. The Report goes on to note that while the Plan acknowledges an "increase in residential lots in the West Valley zone," the Plan also

6

states that residential uses, along with agricultural and silvicultural, "comprise a third major land use component of the West Valley area." From this, the Report determines that "[t]here is no clear indication in the planning documents that the West Valley Zoning District is an exclusively residential zone." This observation is repeated in the "Findings of Fact" section later in the Report:

> The West Valley Zoning District is not strictly defined as residential or agricultural. The Flathead County Zoning regulations and West Valley Neighborhood Plan indicate the district is intended for a variety of uses, including agricultural and silvicultural, while recognizing that areas of West Valley are becoming increasingly residential.

¶9 A second significant issue discussed by the Report concerns the nature of Tutvedt's proposed operation, and whether it qualifies as an "extractive industry." The Report describes Tutvedt's proposed operation as consisting of the "extraction and processing of gravel, limited retail gravel sales, a crushing machine, and an asphalt batch plant . . . ." The Report observes that "gravel extraction" is listed as a conditional use at FCZR § 3.34.080(8), and that the Plan itself states that opportunities for gravel extraction should be allowed. The Report also notes that the term "gravel extraction," and the range of activities included in this term, are nowhere defined in the Regulations. "Extractive industries," however, are defined as "[c]ommercial or industrial operations involving the removal and processing of sand, rock, soil, gravel, or any mineral." FCZR § 7.060.040. Yet "extractive industries" *per se* are not listed as permitted or conditional uses in the District. In other words, "gravel extraction" is permitted but not defined, and "extractive industries" are not permitted in the District but are defined elsewhere in the Regulations. As a result, it is not clear whether the type of "gravel extraction" allowed in the District is

7

synonymous with "extractive industries," or whether "gravel extraction" has a more limited meaning. The Report sums up this ambiguity as follows:

> Disagreement exists among founding members of the West Valley Land Use Advisory Committee as to what was intended by the term "gravel extraction" and if it was meant to limit gravel operations to small "mom and pop" removal of gravel for personal or limited retail use, or if it is intended to be synonymous with "extractive industries", including crushing, batch plant operations, and other associated activities. Review of historical documents related to the creation of the West Valley Zoning District offers no clarification. . . . [T]he intent of the West Valley Neighborhood Plan is subject to debate. The fact that "gravel extraction" is not defined in the Flathead County Zoning Regulations cannot be construed to mean it is synonymous with "extractive industries." No definition exists, however, in either document to clarify exactly what is meant by "gravel operations" and "gravel extraction."

¶10 Unable to determine the precise meaning of "gravel extraction" and unsure about the appropriate standards under which to evaluate the CUP, the Report evaluates Tutvedt's application as if it were a request to establish an "extractive industry." However, the Report makes clear that the final determination as to whether "gravel extraction" is synonymous with "extractive industries" rests with the Board itself. Notably, the Report explicitly conditions acceptance of its recommendation to issue a CUP on a determination by the Board that "gravel extraction" and "extractive industries" are synonymous terms.

> It is recommended that the Flathead County Board of Adjustment adopt staff report #FCU-05-07 as findings of fact and, *if it is determined that the terms "Gravel Extraction" and "Extractive Industries" are synonymous and that it is the intent of the West Valley Neighborhood Plan and the Flathead County Zoning Regulations to allow Extractive Industries in the West Valley District*, grant a Conditional Use Permit subject to the following conditions . . . . (Emphasis added).

¶11 A third relevant aspect of the Report concerns an evaluation of the application under the required criteria at FCZR § 2.060.080. While the Report analyzes Tutvedt's application under all the required criteria, only those criteria bearing on the appealed issues are excerpted below.

**2.06.080 Criteria Required for Consideration of a Conditional Use Permit**

1. A Conditional Use Permit may be granted only if the proposal, as submitted, conforms to all of the following general Conditional Use Permit criteria, as well as to all other applicable criteria that may be requested.

    A. Site Suitability.

        That the site is suitable for use. This includes . . .
            (2). adequate access, and
            (3). absence of environmental constraints

        . . . .

    C. Availability of Public Services and Facilities.

        The following services and facilities are to be available and adequate to serve the needs of the use as designed and proposed . . .
            (6). streets.

    D. Immediate Neighborhood Impact.

        That the proposed use will not be detrimental to surrounding neighborhoods in general. Typical negative impacts which extend beyond the proposed site include:
            (1). excessive traffic generation . . . .

¶12 Two major aspects of Tutvedt's operation discussed in the Report are the potential impacts from increased traffic and impacts on water quality in the District. Under criteria A(2), the Report notes that three neighboring roads will see an increase in traffic as a result of Tutvedt's operation: Farm to Market Road, Church Drive, and West Reserve

Drive. Farm to Market Road will provide primary access to the site and is capable of handling the increased use. Another road, Church Drive, will also be impacted but is described by the Report as "substandard, with a narrow hard drive surface and minimal or no shoulder in some locations." A third road, West Reserve Drive, "currently has significant traffic volume and will be impacted by this use." These factors led the Report to conclude that "impacts to Church Drive and increased traffic volume on Farm to Market Road and West Reserve Drive are cause for consideration." These concerns are reiterated under the "Availability of Public Services and Facilities" criteria, with the Report again noting that "[s]ignificant additional traffic will be generated as a result of this use. . . . Church Drive is substandard and will not accommodate an industrial approach." Lastly, these concerns are repeated again under criteria D(1). "Increased travel on Church Drive is cause for consideration due to the substandard nature of the road, as is increased travel on West Reserve due to its proximity to the West Valley Elementary School." In its "Findings of Fact" section, the Report concludes as follows:

> The location of the site is cause for consideration. While Farm to Market Road is built to State standards and the access point has adequate visibility, Church Drive, West Reserve Drive, and Stillwater Drive, are either heavily traveled or below the standard for the volume of traffic that could be generated by this use.

¶13 The Report discusses impacts on water quality under criteria A(3), "environmental constraints." The Report states that "[p]ublic concerns about water quality and the shallow aquifer are valid, however according to DEQ, extractive industries operated in accordance with department regulations have little to no impact on water quality." As a result, the Report makes no particular findings respecting water quality impacts of the

10

operation, concluding simply that "[r]eview of water quality impacts from this use is under the jurisdiction of the DEQ."

¶14 In conclusion, the Report recommends 27 conditions be attached to Tutvedt's CUP if approved by the Board. While it is not necessary to discuss all of these conditions, several merit consideration because of their bearing on the areas of the Report highlighted above. For instance, conditions numbered 8, 16, and 27 all relate in some manner to the increased traffic impacts. Condition 8 mandates that two-hundred feet of the approach to the operation from Farm to Market Road be paved. Condition 16 requires that signage be erected to alert vehicular and pedestrian traffic of the increase in heavy truck traffic along Farm to Market Road, Church Drive, West Reserve Drive, Stillwater Drive, and West Valley Drive. Condition 27 limits the hours for heavy truck traffic within one mile of West Valley School while school is in session. Notably absent from these conditions, however, is any attempt to address or mitigate what the Report itself repeatedly refers to as the "substandard" condition of Church Road and West Reserve Drive.

¶15 Additionally, condition 15 seemingly addresses the water quality issue noted above by stating that the operation "shall comply with the Montana Opencut Mining Act, as administered by the Montana Department of Environmental Quality."

¶16 On June 14, 2005, the Board held a hearing on Tutvedt's application. The meeting began with a review of the above-mentioned Report by the county planner. After a brief discussion, the Board took oral testimony from proponents and opponents of the operation, including presentations by attorneys from both sides. Many issues and

11

concerns were raised in the course of this hearing. One issue concerned the operation of State law to limit the authority of the Board to deny or modify Tutvedt's application. Proponents of the operation argued that the District was not zoned "residential" and that § 76-2-209, MCA,[1] prevented the Board from denying or limiting Tutvedt's CUP. Opponents of Tutvedt's application disputed this claim, arguing the District was "residential" and that the Board did have authority to limit or deny Tutvedt's CUP under § 209(2).

¶17    Another issue raised in the course of the testimony was whether the Regulations and the Plan allowed for "extractive industries," and whether Tutvedt's proposed operation was permissible under the Regulations and the Plan. Other individuals recited concerns about traffic impacts and water quality issues. Some individuals testified as to the poor quality of the surrounding roads, and questioned how they would be affected by heavy truck traffic. Others, including an expert hydrologist, testified about the potential impacts of Tutvedt's operation on the Lost Creek Fan, an aquifer located in West Valley, and requested that the Board study the matter further before issuing the CUP. There was also discussion about whether the Board could issue a CUP before Tutvedt obtained a reclamation plan from the State. The attorney for Citizens argued that the Regulations required a reclamation plan prior to approval of a CUP, and that the Board had to table the application until the plan had been approved. Many other issues were discussed as well. In all, the testimony lasted over two hours with both sides having ample time to air their views and concerns before the Board.

---

[1] Reproduced *infra* at ¶ 70.

¶18    After public comment was concluded, the Board heard testimony again from the county planner and then began public deliberations. The Board members discussed almost all of the issues raised by the Report and the public testimony, including how the impacts from increased traffic would be handled, whether the District was zoned "residential," whether the Board could consider data and science on water quality impacts, and whether the Board was prohibited from denying Tutvedt's application under § 76-2-209, MCA. The Board also discussed whether the Plan and the Regulations permitted extractive industries in the District, and in particular whether Tutvedt could establish asphalt batch plants in its operations. After discussion was concluded, the Board denied Tutvedt's application for a CUP by a vote of 2 to 2.

¶19    After the vote, the Board members discussed whether they could entertain a motion to amend the CUP and attach an additional condition prohibiting asphalt and concrete batch plant operations. Although not directly consulted, the county attorney volunteered to the Board that it could make such a motion. After this, the Board members spent several minutes formulating the language to be inserted as an additional condition in the CUP. After consensus as to the exact wording, the members passed, by a 3 to 1 majority, a motion to amend the CUP with the additional condition. That amendment became Condition No. 28, which prohibited asphalt and concrete batch plant operations.

¶20    On July 13, 2005, Citizens filed suit against the Board in the Eleventh Judicial District, Flathead County. In their complaint, Citizens alleged the Board's decision violated the Regulations, was arbitrary and capricious, and adversely affected the rights

13

and the health, safety, and well-being of Citizens' members. In particular, Citizens alleged the Board's decision failed to properly determine the District was a residential zone, permitted an unlawful use under the District's Regulations, and was arbitrary and capricious for failing to address the adverse impacts of Tutvedt's operation. Further, Citizens alleged the approval of the CUP violated their right to a clean and healthful environment under Articles II and IX of the Montana Constitution. Based on these allegations, Citizens sought a determination that the CUP issued to Tutvedt was unlawful and that the District is a residential zone, or, in the alternative, for a determination that § 76-2-209, MCA, is unconstitutional as applied to the facts in this case. Citizens subsequently moved for summary judgment on all these issues.

¶21 Tutvedt also intervened in this matter and challenged the Board's decision, albeit on different grounds. Tutvedt argued the Board's prohibition against asphalt and concrete batching was in violation of § 76-2-209, MCA. Tutvedt maintained that the District was not zoned residential and that § 209(3) allowed the Board to reasonably condition, but not prohibit, the complete use, development, and recovery of its gravel resources. Accordingly, the Board could not deny Tutvedt the right to operate asphalt batching plants because this processing was necessary for it to make complete use of its gravel resources. Tutvedt sought a declaration from the District Court that the Board improperly imposed the prohibition on asphalt and concrete batching in the CUP. Additionally, Tutvedt opposed Citizens' arguments seeking to reverse the Board's decision on the grounds discussed directly above.

14

¶22　The Board opposed both parties, and moved for summary judgment to affirm the lawfulness of the Board's decision in all its particulars and the CUP issued to Tutvedt. In opposing Tutvedt's motion, the Board asserted § 76-2-209(2), MCA, allows for the prohibition of gravel operations "within an area zoned as residential," and that the District meets this definition because it was zoned for residential use, even though it is not exclusively a residential zone. Accordingly, the Board was within its authority to allow gravel extraction, a conditional use, while prohibiting asphalt and concrete batch plants, an extractive industry.

¶23　In opposing Citizens, the Board argued its decision was not arbitrary and capricious because it considered and addressed all the required criteria under FCZR § 2.06.080, including traffic safety and water quality impacts. It maintained the CUP allowing extraction and crushing on-site complied with FCZR § 3.34.030(8), which lists "gravel extraction" as a conditioned use. The Board asserted the Regulations, not the Plan, controlled pursuant to § 76-1-605(2), MCA,[2] and since the Regulations did not place any limitations on the extraction of gravel, the CUP issued by the Board was appropriate. The Board also disputed Citizens' claims that Tutvedt's failure to obtain a State-approved reclamation contract prior the Board's approval of the CUP rendered its decision unlawful. The Board noted that under the Opencut Mining Act, §§ 82-4-401-446, MCA, a reclamation permit could not be obtained, and a plan approved, until the Board certified that Tutvedt's operation complied with the Regulations. However, the Board could not make this certification until the CUP was

---

[2] Reproduced *infra* at ¶ 39.

15

approved. Because of this, it was permissible for the Board to first issue the CUP and certify that Tutvedt's operation complied with the Regulations so that regulators with the Department of Environmental Quality (DEQ) could then approve the reclamation plan. Further, the Board countered assertions that its decision violated Citizens' right to a clean and healthful environment. The Board maintained it considered all the pertinent criteria in evaluating Tutvedt's application and attached conditions aimed at mitigating adverse impacts. The Board also argued that the Legislature charged the DEQ, not the counties, with protecting the right to a clean and healthful environment. By requiring Tutvedt to comply with applicable statutes and DEQ regulations, the Board adequately discharged its duty to Citizens' members.

¶24 The District Court granted summary judgment to the Board and denied both Citizens' and Tutvedt's motions for summary judgment. The District Court concluded the Board's decision was not arbitrary and capricious, but that it "was correct both procedurally and substantively." The District Court found the Board correctly determined the District was a residential area, that it considered all the necessary factors in its decision, and that it was within its authority under § 76-2-209, MCA, to prohibit asphalt and concrete batch plants, but allow Tutvedt to extract and crush gravel on site. Both Tutvedt and Citizens timely appealed the District Court's grant of summary judgment to this Court.

**ISSUES**

¶25 We restate the issues on appeal as follows:

¶26　**Issue One**: Did the District Court err in concluding the issuance of the CUP was lawful under the District's Regulations?

¶27　**Issue Two:** Did the District Court err in concluding the Board's issuance of the CUP was not arbitrary and capricious?

¶28　**Issue Three:** Did the District Court err in concluding the Board had the authority to approve the CUP prior to Tutvedt obtaining a State-approved reclamation contract?

¶29　**Issue Four:** Did the District Court err in concluding that under § 76-2-209, MCA, the Board could issue Tutvedt a CUP which prohibited asphalt and concrete batch operations?

¶30　**Issue Five**: Is § 76-2-209, MCA, unconstitutional as applied in this case?

## STANDARD OF REVIEW

¶31　We review de novo appeals from a district court's grant of summary judgment. *Wendell v. State Farm Mut. Auto. Ins. Co.*, 1999 MT 17, ¶ 9, 293 Mont. 140, ¶9, 974 P.2d 623, ¶ 9. We apply the standards established in M. R. Civ. P. 56(c), meaning the moving party must establish " 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Hughes v. Pullman*, 2001 MT 216, ¶ 20, 306 Mont. 420, ¶ 20, 36 P.3d 339, ¶ 20 (quoting M. R. Civ. P. 56(c)). Once this burden has been satisfied, the non-moving party may raise a genuine issue of material fact by presenting substantial evidence essential to one or more elements in the case. *Russell v. Masonic Home of Mont., Inc.*, 2006 MT 286, ¶ 9, 334 Mont. 351, ¶ 9, 147 P.3d 216, ¶ 9. We review a district court's conclusions of law to determine whether or not they are correct. *Russell*, ¶ 9.

17

¶32   "Section 76-2-227, MCA, authorizes the reviewing court to hold a hearing and reverse, affirm, or modify a decision made by a board of adjustment.  A district court is thus bound to review a board of adjustment's decision for an abuse of discretion."  *Arkell v. Middle Cottonwood Bd. Of Zoning Adjustment*, 2007 MT 160, ¶ 24, 338 Mont. 77, ¶ 24, 162 P.3d 856, ¶ 24.  To determine whether an abuse of discretion has occurred, we examine "whether the information upon which the Board based its decision is so lacking in fact and foundation that it is clearly unreasonable and constitutes an abuse of discretion." *North 93 Neighbors, Inc. v. Bd. of Co. Commissioners of Flathead County*, 2006 MT 132, ¶ 44, 332 Mont. 327, ¶ 44, 137 P.3d 557, ¶ 44 (quotation omitted).

## DISCUSSION

¶33   **Issue One:**  Did the District Court err in concluding the issuance of the CUP was lawful under the District's Regulations?

¶34   The District Court concluded that the Board acted within its authority under the Regulations when it issued the CUP to Tutvedt.  Citizens assert this was error.  Citizens point out that the Board issued Tutvedt a CUP for what it termed an "extractive industry," which is neither a permitted nor conditional use in the District's Regulations.  The CUP allows Tutvedt to extract and crush gravel as part of its gravel extraction operation.  Citizens argue that such operations go beyond simple gravel extraction and constitute an "extractive industry" in violation of the Regulations.  Additionally, Citizens assert that under FCZR § 1.04.020 the Board was required to give effect to certain provisions in the Plan, yet failed to do this.  Citizens note the Plan specifically states that "new industrial uses are not to be encouraged but some allowance for limited retail commercial may be

18

OK, with restrictions . . . ." Further the Plan states that, "[i]ndustrial uses should not be permitted except those accessory to normal farm operations." Citizens argue the Tutvedt operation is a significant commercial undertaking and is not accessory to normal farm operations. Since FCZR § 1.04.020 states that more restrictive provisions in a neighborhood plan should control in such instances, these provisions in the Plan should preclude Tutvedt's operation.

¶35 The Board counters Citizens' claims and argues its decision to allow gravel extraction did not violate the Regulations. It notes that "gravel extraction" is a conditional use under the District's Regulations. Since this term is not explicitly defined in the Regulations, the common definition of extraction should be used. Because the verb "to extract" means "to draw out or forth; to pull from a fixed position," Tutvedt should be allowed to operate a crusher because "[i]n order to extract gravel, not just earth and rocks, crushing is necessary." Further, the Board argues it did not equate gravel extraction with extractive industries, but only evaluated Tutvedt's operation as an "extractive industry" because no other standard was provided in the Regulations. The Board points out that it allowed only "gravel extraction" as evidenced by the fact the CUP allowed Tutvedt to crush gravel as part of gravel extraction, but denied it the opportunity to engage in concrete and asphalt batching.

¶36 The Board also disputes Citizens' contention that more restrictive provisions in the Plan are controlling in this case. The Board argues that § 76-1-605(2), MCA, operates to specifically prohibit provisions in the Plan from controlling land use in the District. The

Board argues that Section 605 only permits duly enacted zoning regulations, not a growth policy such as the Plan, to control land use decisions.

¶37 To resolve this dispute, we must first look to the Regulations themselves. As a general rule, the Board is bound to apply the zoning regulations as promulgated by the Commissioners. *See* FCZR § 2.03.040; § 76-2-223, MCA.[3] "[A] board cannot . . . disregard the provisions of, nor exceed the powers conferred by, a zoning ordinance and must act in accordance with the law." 101A C.J.S. *Zoning and Land Planning* § 232 (2007) (footnotes omitted). In interpreting zoning ordinances, we apply the basic rules of statutory construction. *Schanz v. City of Billings*, 182 Mont. 328, 332, 597 P.2d 67, 69 (1979). "If the language of an ordinance is plain and unambiguous, it is not subject to interpretation or open to construction but must be accepted and enforced as written." *Schanz*, 182 Mont. at 332, 597 P.2d at 69. Our first task, then, is to interpret the zoning ordinances according to their plain meaning in order to give effect to the intent of the boards of county commissioners which have enacted them. *Missoula Co. v. Am. Asphalt Inc.*, 216 Mont. 423, 426, 701 P.2d 990, 992 (1985). If a plain meaning analysis does not reveal the intent of the board, we may resort to other rules of statutory construction. *Am. Asphalt*, 216 Mont. at 426, 701 P.2d at 992. Moreover, when examining zoning "ordinances [we] will not . . . read [them] so narrowly as to restrict the plain meaning of the whole law . . . [but will] construe [them] in a manner that will give effect to them

---

[3] We note that the Board does have the power to grant a variance in situations where the literal enforcement of zoning regulations would result in "unnecessary hardship." Section 76-2-223(1)(c), MCA. Tutvedt never sought a zoning variance in this case, so the Board is bound to follow the Regulations.

all . . . ." *Schendel v. Bd. of Adjustment of the City of Bozeman*, 237 Mont. 278, 284, 774 P.2d 379, 383 (1989) (quotations and citations omitted).

¶38     Citizens and the Board both agree that the District's Regulations do not permit extractive industries. They disagree, however, on whether the operation allowed by the CUP in this case constitutes an "extractive industry."  At the outset, we agree with Citizens that the Board's position in this matter seems somewhat inconsistent.  On the one hand, the Board acknowledges that "extractive industries" are not permitted or conditional uses in the District.  On the other hand, the Board seems to have approved what it itself considers to be an "extractive industry."  The Report evaluates Tutvedt's operation as if it were an extractive industry, and is entitled "Staff Report #FCU-05-07(a), Tutvedt Family Partnership, Extractive Industry."  Moreover, the Report explicitly states that the Board should issue a CUP only if it determines that "the terms 'Gravel Extraction' and 'Extractive Industries' are synonymous and that it is the intent of the West Valley Neighborhood Plan and the Flathead County Zoning Regulations . . . to allow Extractive Industries in the West Valley District . . . ." See ¶ 10.  By approving the CUP, the Board seems to have implicitly assented to the notion that these terms are in fact synonymous.  Moreover, in a letter sent to Tutvedt by the Board on June 15, 2005, it specifically states that "[t]he Board made a motion to approve your request for an extractive industry with amended conditions.  The amended conditions are attached with your permit."  While we understand that the Report evaluated the application under the "extractive industry" standard simply because no other standard was provided, these facts

nonetheless suggest that, from the Board's perspective at least, it issued a CUP for an extractive industry. This position is at odds with its current argument before the Court.

¶39 Another factor complicates the Board's position here. We disagree with the Board's assertion that the Plan is not applicable to the Board's decisions by virtue of § 76-1-605(2), MCA. In fact, the opposite is true. Section 76-1-605(2), MCA, provides as follows:

> (a) A growth policy is not a regulatory document and does not confer any authority to regulate that is not otherwise specifically authorized by law or regulations adopted pursuant to the law.
> (b) A governing body may not withhold, deny, or impose conditions on any land use approval or other authority to act based solely on compliance with a growth policy adopted pursuant to this chapter.

¶40 Contrary to the Board's contention, this statute does not prohibit the enforcement of growth policies in all circumstances but simply states that a growth policy or master plan only acquires legal force by virtue of another law or regulation. Section 1.040.020 of the Regulations provides the type of authority contemplated by this statute by stating "where a neighborhood plan . . . contains aspects related to zoning and is under the jurisdiction of these regulations, the provisions that are more restrictive shall control." Because the Plan is "specifically authorized by law or regulations adopted pursuant to the law" by virtue of FCZR § 1.040.20, it does confer authority to regulate and therefore the provisions of the Plan that are more restrictive must indeed control.

¶41 In this case, the Plan "[a]llow[s] opportunities for gravel extraction" but also states that "[i]ndustrial uses should not be permitted except those accessory to normal farm operations." These two provisions relate to zoning, are under the jurisdiction of the

22

Regulations, and are applicable in the instant case. On the surface, Tutvedt's operation cannot be reconciled with the plain language of these provisions. On the one hand, it could be seen as a limited gravel extraction operation in that concrete and asphalt batching is prohibited. On the other, Tutvedt has never alleged that its proposed gravel operation is intended to be "accessory to normal farm operations."

¶42 Because Tutvedt is the applicant in this case, it bears the burden of proving the operation complies with the requirements of the Regulations. "The burden of proof for satisfying the aforementioned criteria shall rest with the applicant and not the Board of Adjustment. The granting of a Conditional Use Permit is a matter of grace, resting in the discretion of the Board of Adjustment and a refusal is not the denial of a right, conditional or otherwise." FCZR § 2.06.090. One of the threshold determinations which must be met is that the use itself is permitted under the Regulations. *See* FCZR § 2.06.020. Given the uncertainty as to the meaning of "gravel extraction" as a conditional use in this case, it rests with Tutvedt to demonstrate that its proposed operation is consistent with the District's Regulations and the Plan. However, Tutvedt's application does not make this showing. In the first instance, Tutvedt does not show that its proposed operation is consistent with the type of gravel extraction allowed under the Plan and the District's Regulations, and is distinguishable from an extractive industry *per se*. Second, Tutvedt does not demonstrate that its operation is "an industrial use [which is] accessory to normal farm operations," or that its proposed operation does not run afoul of any controlling provisions in the Plan. By failing to make this showing, Tutvedt does

23

not prove its proposed operation is a permitted or conditional use under the Regulations and the Plan.

¶43    Further, the Board itself failed to make any determinations on these issues as well. Although the question arose as to how Tutvedt's operation was accessory to normal farm operations, an answer was never provided and factual findings were never made. There is no indication in this record that the Board looked at the relevant provisions of the Plan in light of FCZR § 1.04.020 and made an attempt to reconcile those controlling provisions of the Plan with Tutvedt's operation. Nor were there any findings that "gravel extraction" includes extraction of gravel and on-site crushing. While the Board members obviously believed crushing was a part of gravel extraction, they provide no factual foundation for their position.

¶44    There are important reasons why the Board should have made determinations on these issues prior to approving Tutvedt's CUP. First, such findings were required by the Report itself as a pre-condition to adopting its recommendations to the Board. The Report stated that its recommendations should only be adopted if it was determined that "gravel extraction" and "extractive industries" were synonymous. See ¶ 10. In light of the circumstances, the Board should have either found that the Regulations allow for "extractive industries" in the District, or should have distinguished Tutvedt's proposed operation from an "extractive industry" as that term is defined at FCZR § 7.06.040. Because a determination on this issue was central to an acceptance of the Report's recommendation to approve the CUP, failure to make this determination leaves it unclear

as to how much of the Report's reasoning and conclusions were actually adopted by the Board in its final decision.

¶45 While it appears that members of the Board believed an extraction and crushing operation did not constitute an "extractive industry" as defined in the Regulations, nothing in the record indicates the factual basis for their decision. On-site crushing may be contemplated by the term "gravel extraction" as used in the Regulations, but the opposite could be true as well. The addition of crushing operations to the extraction of gravel could be viewed as an aspect of "processing" as that term is used in FCZR § 7.06.040, and thus constitute an "extractive industry." Other courts have drawn a distinction between "gravel extraction" itself and aspects of processing gravel such as crushing, washing and screening. *E.g.*, *Am. Ashpalt*, 216 Mont. at 427-8, 701 P.2d at 993 (stating that "gravel processing on site includes washing, crushing, screening, and concrete and asphalt batching . . . ."); *Kuhl v. Zoning Hearing Bd. of Greene Tp.*, 415 A.2d 954, 956-7 (Pa. 1980) (noting that cessation of gravel crushing and washing operations did not constitute abandonment of a gravel pit while extraction continued); *In Re Barlow*, 631 A.2d 853, 855-56 (Vt. 1993) (discussing gravel extraction separate and apart from operating a gravel crusher). Given the importance of this distinction, the Board should have provided a factual foundation for its implicit conclusion that crushing on-site does not constitute an "extractive industry," while on-site asphalt and concrete batch operations do.

¶46 Second, the Regulations themselves require the Board to make specific findings on these issues. "Every decision of the Board of Adjustment pertaining to the granting,

25

denial, or amendment of a request for a Conditional Use Permit shall be based upon 'Findings of Fact', and every finding of fact shall be supported in the records of its proceedings." FCZR § 2.06.100. An implicit decision that Tutvedt's operations are consistent with the Regulations and the Plan pertains directly to the granting and amendment of Tutvedt's CUP. Yet, the Board never issued any findings on whether the Plan and the Regulations would permit on-site extraction and crushing of gravel where such operations are not incident to normal farm operations. As such, the Board's decision was not supported by the specific findings of fact required under FCZR § 2.06.100.

¶47 Lastly, basic principles of administrative and zoning law require these findings in order to develop an adequate administrative record. As we have stated previously, it is a "general principle of administrative law . . . [that] the record developed by an agency . . . serves to flesh out the pertinent facts upon which a decision is based in order to facilitate judicial review." *North 93 Neighbors*, ¶ 30 (quotation omitted). "The record made before a board of adjustment is essential to an enlightened determination of its action by a governing body or by a court on review." E.C. Yorkley, *Zoning Law and Practice* vol. 3, § 18-9(f), 18-62 (Douglas Scott MacGregor ed., 4th ed. Lexis 2007). The absence of a developed record in this case places the Court "in the untenable position of having to substitute its own judgment for the Board's judgment." *North 93 Neighbors*, ¶ 30.

¶48 Here, a number of important questions remain unanswered following our review of the Board's proceedings. We do not know what is meant by "gravel extraction" as used in the Regulations, or whether the Plan allows only gravel extraction when it

supports normal farm operations. Similarly, we have no factual basis upon which to determine when "gravel extraction" stops, and at what point various forms of gravel processing turn "gravel extraction" into an "extractive industry." The Report notes significant ambiguity on these questions, but declines to provide any answers, leaving that task to the Board itself. See ¶¶ 9-10. The Board, however, never directly answers these questions with the level of factual findings required by principles of administrative law and the specific requirements of the Regulations themselves.

¶49 Accordingly, we reverse the District Court and remand this issue for further proceedings. The District Court may exercise its broad powers of review under § 76-2-227, MCA. However, the primary purpose of a remand in this situation is to have the Board come forward with some findings of fact and conclusions to support its decision on the issues discussed directly above. *See* Arden H. Rathkopf, *The Law of Zoning and Planning* vol. 4., § 42.07, 42-108[b] (Edward H. Ziegler, Jr. ed., 4th ed. West 1996) (discussing purpose of remanding decisions from a board of adjustment). In particular, there must be findings and related conclusions of law as to the following issues: (1) whether the Regulations and the Plan permit a gravel extraction operation that is not accessory to normal farm operations, and (2) whether on-site crushing operations are a part of "gravel extraction" as that term is used in the Regulations, or whether the use of on-site crushing operations constitutes an "extractive industry" under FCZR § 7.06.040.

¶50 While a remand for further findings of fact and conclusions of law would normally render further appellate issues temporarily moot, we conclude it is appropriate to address

the remaining issues stemming from the granting of the CUP in this case so as to provide further guidance thereon following remand.

¶51 **Issue Two:** Did the District Court err in concluding the Board's issuance of the CUP was not arbitrary and capricious?

¶52 The District Court found that the Board's action was not arbitrary and capricious, and that its final decision "was correct both procedurally and substantively." Citizens contend the District Court erred because the Board's decision did not adequately address either the impacts from increased traffic on affected roads in the West Valley, or the impacts on water quality from Tutvedt's operation on the Lost Creek Fan. Citizens note that under FCZR § 2.06.090, Tutvedt has the burden of proving his application satisfies all the required criteria listed at § 2.06.080. See ¶ 11. Citizens maintain Tutvedt's application was "woefully deficient" by failing to address water quality and traffic impacts, and that it therefore failed to satisfy these criteria. Citizens point out that the Board repeatedly noted the substandard conditions of the roads to be utilized by Tutvedt's operation, but that neither the application nor the conditions attached to the CUP show how these impacts will be addressed. Further, Citizens note that expert and citizen testimony was given about existing water quality issues in the Lost Creek Fan, and that the Report observed water quality concerns were "valid." Nevertheless, Tutvedt's application provided no water quality information about the impacts its operation would have on ground water. The Report simply assumed that compliance with DEQ regulations would be sufficient to protect water quality in the West Valley.

28

Citizens maintain the Regulations require the Board to do more to address these issues, and that its failure to do so renders its decision arbitrary and capricious.

¶53 The Board argues its decision was not arbitrary and capricious because it did consider all the impacts as required by the Regulations. The Board notes that it imposed 28 conditions on Tutvedt's CUP, and that, in its Report and in public testimony, it properly considered all the impacts from Tutvedt's operation. The Board therefore asserts that Citizens' contentions are without merit.

¶54 Once again the plain language of the Regulations must first be considered in order to resolve this dispute. FCZR § 2.06.090 clearly places the burden of proof on the applicant, not the Board, to show that the criteria listed in § 2.06.080 have been satisfied. Moreover, the Regulations require the Board to make specific findings of fact to support its decision, and further state that "[a] mere finding or recitation of the enumerated conditions, unaccompanied by findings of specific fact, shall not be deemed in compliance with these regulations." FCZR § 2.06.100. Accordingly, when water quality and traffic impacts have been identified, the CUP application must show how those impacts are addressed, and the Board must make specific findings of fact showing that the criteria have been satisfied. While we may not substitute our discretion in this matter for that of the Board, we must evaluate the Board's decision in light of these criteria in order to determine whether the Board's "decision is so lacking in fact and foundation that it is clearly unreasonable and constitutes an abuse of discretion." *North 93 Neighbors*, ¶ 44 (quotation omitted).

29

¶55    In light of the plain language of FCZR § 2.06, we agree with Citizens that the District Court erred, and that the Board abused its discretion in issuing the CUP. The Board's own findings show that substandard roads will see an increase in traffic due to Tutvedt's operation, yet its decision is devoid of any factual findings or foundation to show how the conditions it attached to the CUP will address those impacts. The Regulations specifically require the Board to ensure that there are available and adequate streets and access to support Tutvedt's operation. FCZR §§ 2.06.080(1)(A)(2) and (1)(C)(6). The Regulations also require the Board to ensure that "the proposed use will not be detrimental to surrounding neighborhoods . . . [with respect to] excessive traffic generation . . . ." FZCR § 2.06.080(1)(D)(1). If anything, the relevant findings in the Report suggest that Tutvedt's operation will not satisfy these criteria. See ¶ 12.

¶56    Here, there are repeated findings that the roads are "substandard" and that the impacts from increased traffic are a "cause for concern." The Board notes that it imposed conditions to limit the hours of traffic, to increase signage, and to conduct actions to abate the dust (See ¶ 14), but neither Tutvedt's application nor the Board's decision contain any factual foundation showing how the imposed conditions will address the impacts on the substandard roads. While it is possible conditions could be imposed to mitigate the traffic impacts from Tutvedt's operation—e.g., improving the conditions of the roads themselves—Tutvedt's application fails to propose them and the Board failed to address this issue. Given these unresolved issues, the issuance of the CUP was unreasonable and constitutes an abuse of discretion.

¶57 Similarly, we agree with Citizens that the Board abused its discretion when it failed to issue any findings of fact whatsoever on water quality impacts, and simply entrusted its obligation to the DEQ. Section 2.06.080(1)(A)(3) specifically requires the Board to making findings as to the "absence of environmental constraints" with respect to the suitability of the proposed site. Yet the Board issued no findings on this point, instead opining that compliance with DEQ permitting regulations would assure the criteria would be satisfied. While this may turn out to be the case, without any specific findings of fact it is either an opinion or a belief, and does not meet the requirements contained the Regulations. "A mere finding or recitation of the enumerated conditions, unaccompanied by findings of specific fact, shall not be deemed in compliance with these regulations." FCZR § 2.06.100. At a minimum, the Board must provide some reasoning or factual foundation for its belief that compliance with DEQ regulations would be sufficient to discharge its obligation under the Regulations.

¶58 While Board members are not required to be expert hydrologists in order to comply with the Regulations, they must make some type of findings on these issues. It is not outside the ken of the informed citizen to receive and process basic information on impacts relating to water quality, as evidenced by citizen testimony on water quality issues given to the Board during the hearing. Moreover, it should be remembered that the burden in this case is on Tutvedt to show its operation is in compliance with the Regulations. Yet nothing in the application, or the Board's proceedings, provides any facts, studies, or information to show that the proposed site has an absence of the environmental concerns raised by Citizens in reference to the Lost Creek Fan.

31

¶59    The Board is bound by the District's Regulations and may not hand off its obligations thereunder to the DEQ.  "Boards of appeal or adjustment are statutory creations entrusted with the duty of enforcing the provisions of the zoning ordinance and generally adjusting difficulties arising in the application of such ordinances in the public interest."  101A C.J.S. *Zoning and Land Planning*, § 219 (footnotes omitted).  While it is not necessary for us to precisely define the Board's duty to address this issue, at a minimum the Regulations require Tutvedt adequately address the impacts its proposed operations may have on water quality in the West Valley.  While compliance with DEQ regulations might be sufficient to protect water quality in the West Valley, it is still incumbent upon the Board to provide some level of factual foundation for this position.  In this case, the Board abused its discretion by failing to provide such a factual foundation for its decision, other than a belief that compliance with unspecified DEQ regulations will automatically be sufficient to discharge its duties under the FCZR.

¶60    In concluding the Board abused its discretion, we do not in any way impugn the Board members' conduct in this matter.  A review of the proceedings demonstrates that Board members were faced with difficult choices, conflicting information, and a considerable degree of social pressure.  In spite of these challenges, Board members handled themselves in a professional and thoughtful manner, and gave residents of the West Valley an open forum in which to debate and discuss these matters.  Nonetheless, the District's Regulations are specific in describing the procedure to be followed by the Board when issuing a CUP.  The Board's decision in this case was not in compliance

with these legal requirements and did not adhere to the general principles of administrative law.

¶61 We reverse the District Court grant of summary judgment to the Board and remand this issue for further proceedings. As noted above at ¶ 49, the District Court has broad powers to review the Board's decision under § 76-2-227, MCA. Further, in the event the District Court vacates the Board's decision, Tutvedt is not without a remedy; it may reapply for a CUP pursuant to FCZR § 2.06.070 after one year, or sooner if "sufficient new evidence or conditions are offered to the Zoning Administrator to demonstrate to him that circumstances have altered and that further consideration of the application is warranted."

¶62 **Issue Three:** Did the District Court err in concluding the Board had the authority to approve the CUP prior to Tutvedt obtaining a State-approved reclamation contract?

¶63 The District Court concluded that the Board did not err when it approved the CUP prior to Tutvedt obtaining an approved reclamation contract from the State because "[n]o reclamation plan could be developed until the CUP was approved." Citizens contend this was error, because the Regulations clearly require that a reclamation contract be signed and approved by the State *prior to* the issuance of a conditional use permit. FCZR § 4.10.10.[4] However, as the Board points out, the Opencut Mining Act, §§ 82-4-401-446,

_____

[4] FCZR § 4.10.10 states as follows: "Requirements contained in this section shall not exempt the owner or operator of an extractive industry from compliance with the Montana Opencut Mining Act . . . but shall be in addition to the requirements of said act. Prior to the approval by the Board of a conditional use permit, a reclamation contract shall be signed and approved by the owner or operator and the Montana Department of Natural Resources." Under the applicable

33

MCA, requires an application for an open cut mine permit to contain a statement from the Board certifying that the proposed operation complies with applicable zoning regulations. § 82-4-432(2)(c), MCA. However, the Board cannot issue this certification until it has approved the CUP, because only after the CUP has been approved is the operation officially certified as in compliance with the Regulations. In other words, while the Regulations require a finalized reclamation contract prior to approval of a conditioned use permit, the State cannot approve a permit and finalize such a contract until the Board can certify that the operation is in compliance with zoning regulations; an act which the Board cannot do until it has approved the CUP.

¶64 In essence, the Board is caught in a classic Catch-22 situation: it cannot issue a CUP until a reclamation contract has been approved, and a reclamation contract cannot be approved until a CUP has been issued. The Board urges us to ameliorate this situation by affirming its decision to issue "a conditional use permit, with appropriate conditions, to enable the State regulators to proceed." Citizens, on the other hand, assert we should find the Board's decision unlawful, because only the Commissioners and State regulators have the power to harmonize the statutes and the Regulations. Citizens note that prior approval of the reclamation contract is not simply "another bureaucratic step. Requiring a potential pit operator to submit a detailed reclamation plan before the CUP process is complete ensures that both the Board and the public will understand the impacts of the

_____

version of the statute, the DEQ administers such contracts. §§ 82-4-403(3) and 421, MCA (2005).

34

proposed operation *before* the Board makes a decision whether to allow the pit, condition it, or deny it."

¶65 Resolution of this issue turns squarely upon the Board's authority to modify or simply ignore the clear provisions of FCZR § 4.10.10. The powers of boards of adjustment are described at § 76-2-223, MCA. This statute provides as follows:

> **Powers of board of adjustment**. (1) The board of adjustment shall have the following powers:
> (a) to hear and decide appeals where it is alleged there is error in any order, requirement, decision, or determination made by an administrative official in the enforcement of this part or of any resolution adopted pursuant thereto;
> (b) to hear and decide special exceptions to the terms of the zoning resolution upon which said board is required to pass under such resolution;
> (c) to authorize upon appeal in specific cases such variance from the terms of the resolution as will not be contrary to the public interest and where, owing to special conditions, a literal enforcement of the provisions of the resolution will result in unnecessary hardship and so that the spirit of the resolution shall be observed and substantial justice done.
> (2) In exercising the above-mentioned powers, the board of adjustment may, in conformity with the provisions of this part, reverse or affirm, wholly or partly, or modify the order, requirement, decision, or determination appealed from and may make such order, requirement, decision, or determination as ought to be made and to that end shall have all the powers of the officer from whom the appeal is taken.

¶66 While the statute does grant the Board the ability to authorize zoning variances in situations where a literal enforcement would result in unnecessary hardship, nowhere does it grant the Board the authority to ignore, alter, or nullify duly enacted zoning ordinances. Because the Board's authority is constrained by the statute, unless the statute authorizes the Board to ignore or reinterpret the Regulations, it has no power to do so. "It is beyond debate that a board may not exceed the powers placed in its hands by statute."

E.C. Yorkley, *Zoning Law and Practice* vol. 3, § 19.2, 19-10 (collecting authorities); *See also* 101A C.J.S. *Zoning and Land Planning*, § 224.

¶67   We appreciate the difficult situation in which the Board is placed by the conflicting statutes and zoning regulations governing its conduct here.  However, the Board does not cite to any legal authority in support of its argument to ignore the Regulations in this case.  Yet the simple fact remains that the Board has no power or authority to alter or ignore the District's Regulations, even if the Regulations effectively tie the Board's hands.  Moreover, it is not the Court's province to rewrite the Regulations to allow the Board to issue a CUP prior to obtaining an approved reclamation contract with the State.  That obligation lies with either the Commissioners, the Legislature, or the State, and it is up to those bodies to reconcile those differences.

¶68   For these reasons, we reverse the decision of the District Court finding that the issuance of the CUP was lawful despite its non-compliance with FCZR § 4.10.10.

¶69   **Issue Four:**  Did the District Court err in concluding that under § 76-2-209, MCA, the Board could issue Tutvedt a CUP which prohibited asphalt and concrete batch operations?

¶70   Tutvedt faults the Board for not giving it a broader CUP which would allow it to operate concrete and asphalt batch plants.  The District Court determined the Board was within its statutory authority to issue Tutvedt a CUP which prohibited asphalt and concrete batching, and consequently denied Tutvedt's motion for summary judgment challenging the lawfulness of the Board's decision under § 76-2-209, MCA.  The relevant provisions of § 209 provide as follows:

(2) The complete use, development, or recovery of a mineral by an operation that mines sand and gravel or an operation that mixes concrete or batches asphalt *may be reasonably conditioned or prohibited* on a site that *is located within a geographic area zoned as residential, as defined by the board of county commissioners.*

(3) Zoning regulations adopted under this chapter *may reasonably condition, but not prohibit,* the complete use, development, or recovery of a mineral by an operation that mines sand and gravel and may condition an operation that mixes concrete or batches asphalt *in all zones other than residential.*

Sections 76-2-209(2) and (3), MCA (emphasis added).

¶71 The District Court reviewed this statute and determined it "does not require that the zone in which the property is located be denominated 'Residential.' " The District Court further found the Board correctly determined Tutvedt's property was "residential. . . [and] located in a zone classification which permits, and in which there exists, substantial residential use." Accordingly, the District Court concluded Tutvedt's property was "within a geographic area zoned as residential," and that the condition in the CUP was properly imposed under the authority granted the Board by virtue of § 76-2-209(2), MCA.

¶72 The kernel of Tutvedt's argument is that the District is not zoned "residential," and should be considered zoned "other than residential" within the meaning of § 209(3). Tutvedt asserts the Board never determined that its property is residential or in a residentially zoned area but in fact concluded the District was not zoned "strictly residential." Because of this, Tutvedt argues, § 209(3) applies. Under § 209(3), "in all zones other than residential" the Board "may reasonably condition, but not prohibit, the complete use, development, or recovery of" Tutvedt's mineral resources. Section

76-2-209(3), MCA. Tutvedt maintains the prohibition on concrete and asphalt batch plants in Condition No. 28 of the CUP denies it the ability to make complete use of its gravel resources because it is too cost-prohibitive to extract the gravel and then transport it to another location for processing.

¶73 Accordingly, Tutvedt contends the District Court erred in denying its summary judgment motion. Tutvedt argues the District Court incorrectly concluded that the Board correctly determined the area was a residential area, because no evidence existed in the record to support this finding. Tutvedt maintains it showed an absence of any genuine issue of material of fact as to whether the District was zoned "other than residential," and that Citizens and the Board failed to counter this point.

¶74 Citizens and the Board urge us to affirm the District Court's decision. They assert the District Court correctly concluded that the Board determined the District to be zoned "residential," and that the Board was within its statutory authority under § 76-2-209(2), MCA, in issuing a CUP which prohibited concrete and asphalt batch plants. Both Citizens and the Board point to evidence in the Report and before the Board which supports their contention that the District is zoned "residential." Citizens assert that Tutvedt asks this Court to read the word "exclusively" into § 76-2-209(2), MCA, meaning that § 209(2) applies only to zones with solely residential use. The Board argues that in adopting § 76-2-209, MCA, the Legislature did not require the use of any special terminology by boards of county commissioners, and that the District, because it is zoned for residential use, is exactly the type of zoning district contemplated by § 209(2). Accordingly, the Board had the power to completely prohibit any gravel

development, and did not exceed its authority in prohibiting asphalt and concrete batch plants as a condition to the CUP.

¶75     Resolution of this issue turns on the intent of the Legislature in passing § 209(2) and (3), and the meaning of the term "residential" a used in the statute. As we have stated before, our primary purpose in construing statutes is to give controlling effect to the legislative intent, looking first to the plain meaning of the words used in the statute. *Merlin Myers Revocable Trust v. Yellowstone Co.*, 2002 MT 201, ¶ 19, 311 Mont. 194, ¶ 19, 53 P.3d 1268, ¶ 19. Section 76-2-209(2), MCA, states that the Board may reasonably condition or prohibit concrete and asphalt batching operations "on a site that is located within a geographic area zoned as residential, as defined by the board of county commissioners." Under § 209(3), "in all zones other than residential" the Board "may reasonably condition, but not prohibit" such operations. In other words, if the District is considered zoned "other than residential," under § 209(3) the Board may only reasonably condition Tutvedt's operation. In this case that would mean that the Board must allow Tutvedt to operate concrete and asphalt batch plants. On the other hand, if the District is considered "residential" within the meaning of § 209(2), the Board has the authority to prohibit Tutvedt's operation outright. In that case, a limited gravel extraction with a prohibition on asphalt and batch plants would be within the Board's lawful authority.

¶76     The American Heritage Dictionary defines "residential" as "[o]f, suitable for, or limited to residences: *residential zoning*." *American Heritage Dictionary of the English Language* 1483 (4th ed. Houghton Mifflin 2000). In light of the dispute before the Court, this definition is of little help. In fact, it reproduces precisely the opposing arguments

before the Court. On the one hand, Citizens and the Board argue that "residential" refers to an area that is "[o]f, [or] suitable for" residences. On the other hand, Tutvedt argues that "residential" refers to areas that are "limited to residences." The plain meaning of the term "residential" could reasonably support the arguments of both parties.

¶77 However, the lack of a conclusive definition of "residential" here does not necessarily compel us to go beyond the plain meaning of the statute. Here, the statute conditions whether a geographical area is zoned "residential" on the definition given that zone by the board of county commissioners. In other words, if the Commissioners have indicated that the District is "residential," we need not go beyond the plain language of the statute.

¶78 A review of the Regulations and the Plan itself shows that the Commissioners have zoned the District as "residential" within the meaning of § 209(2). Even though the District embraces residential, agricultural, and silvicultural uses, both the Plan and the Regulations themselves show that the primary purpose in rezoning the District was to regulate residential development and to maintain the suitability of residences, alongside other uses which have been traditionally practiced in the West Valley area. We agree with the District Court that § 209 does not require a zone be denominated solely "Residential," for § 209(2) to apply. Since Tutvedt produces no evidence beyond the plain language of the statute in support of its argument concerning its interpretation of § 209, we decline to adopt Tutvedt's construction of that statute.

¶79    In cases such as this where non-traditional,[5] uniquely zoned, multi-use geographical areas like the District are under consideration, a determination of whether a geographic area is zoned "residential" for purposes of § 209 must be based on facts and circumstances.  Here, the regulations and the Plan demonstrate that the District has been specifically zoned to promote and regulate residential use, and is a "residential" district for purposes of § 209.

¶80    As noted above at ¶ 5, the Regulations define the District as "[a] district to promote orderly growth and development in the West Valley area consistent with the community vision statements as expressed by the text and map exhibits of the West Valley Neighborhood Plan, County Resolution #1226-A."  We agree with Citizens that the "growth and development" in this definition refers primarily to residential development.  A review of the Plan itself confirms this view.[6]  In the first instance, it is difficult to overlook the significance of calling the Plan a "neighborhood" plan, and by referencing this "neighborhood" plan in the definition of the District itself.  Further, as noted above at ¶ 3, a simple "Residential" designation was not placed on the District because such a designation would not capture the unique residential qualities of the District itself.  As the Plan itself notes, "[t]he uniform application of a single zoning district to such a large area fails to recognize the variability of land features throughout

---

[5] An example of a more traditional designation for a residential zone would be "R-1 Suburban Residential."  See FCZR § 3.09.

[6] Consideration of a growth policy or a master plan may not be appropriate in all cases to determine whether a zoning district is "residential."  In this case it is because the Regulations specifically define the District with reference to the community vision statements provided in the Plan.

41

the district. Not all the land can easily be classified as either 'timber' or 'agriculture', especially when considering how the land use character of the area has changed dramatically, even with zoning in place. The liberal use of subdivision exemptions (family transfers, occasional sales) over the past 17+ years has created a suburban development pattern in many locations."

¶81 That residential development is at the center of the Plan and the definition of the District itself, is confirmed by considering the vision statements, goals, and policies contained with the Plan itself. All of the goals and policies are centered primarily around residential concerns. See ¶ 4. The "Implementation" section of the Plan further demonstrates that the overarching goals in devising a land use strategy in the District were primarily residential. As the Plan states, "[t]he top four reasons for choosing to live or own property in the West Valley are: rural setting; lots of open space; low crime rate; and easy commute." Clearly, then, the central focus of the Plan is the maintenance of a livable, residential area. Indeed, although agricultural and silvicultural uses are discussed in the Plan, and their preservation is encouraged, the Plan also recognizes these uses may be subordinated to residential demands at some point in the future. For instance, under the "Agriculture/Forestry Policies" section of the Plan, it specifically encourages the development of residential uses on " 'poor soils' within a larger agricultural district, farm, or forest land or when public pressures no longer make farming or forestry feasible." In total, roughly five pages of the Plan are devoted to either agricultural or silvicultural issues, while roughly twenty pages of the Plan discuss issues related to

42

"residential" concerns, including residential development, limiting industrial and commercial uses, open space, transportation, utilities, emergency services, and schools.

¶82 Also instructive in this regard are the Regulations themselves. A review of the Regulations in § 3.34 shows an almost exclusive concern for the orderly development of residential uses throughout the West Valley. As Citizens point out, § 3.34 regulates a variety of aspects pertaining to residential use such as standards relating to: the construction of dwellings; future subdivision development; residential clustering; operation of a neighborhood convenience store; and the operation of home-based businesses. Although it is true that strictly residential uses are not the only ones permitted in the District, that is true even in those zoning districts designated explicitly "Residential." We agree with Citizens that a reading of the District's Regulations shows that they were designed primarily to effectuate a residential zone.

¶83 The case at bar is distinguishable from *Merlin Myers* on which Tutvedt relies. In that case, there was an area zoned Agricultural-Open Space in which residences, a school, and a public park were located. A property owner within that area sought to establish a gravel mining operation, similar to the one Tutvedt applied for here. A report prepared for the Yellowstone County Board of County Commissioners indicated that the county could not prohibit such operations under Montana law. Ultimately, the Yellowstone Commissioners rejected the property owner's application stating that "permitting the application would violate the Montana Constitutional rights of students at [a neighboring school] to a clean, healthful and safe environment." *Merlin Myers*, ¶ 8 (alteration in original).

43

¶84    The applicant challenged the Yellowstone Commissioners decision to the District Court, advancing an argument very similar to the one here.  The applicant argued "that under §§ 76-1-113 and 76-2-209, MCA, local planning boards may not prevent the operation of a gravel facility in a nonresidential area." *Merlin Myers*, ¶ 14.  The District Court agreed with the applicant, and overturned the decision of the Yellowstone Commissioners.  On appeal, we affirmed the District Court.  We held that the Yellowstone Commissioners could not ignore the plain language of § 209, and refuse to comply with its requirements simply because they thought it violated the right to a clean and healthful environment under Art. II, § 3 and Art. IX, § 1 of the Montana Constitution. *Merlin Myers*, ¶ 22.  In that case, the zoned character of the area was never in dispute. The issue instead was whether the Yellowstone Commissioners could ignore the plain language of the statute when they thought it violated the Montana Constitution.  We held they could not.

¶85    Tutvedt's attempts to apply *Merlin Myers* in the instant case are unavailing.  Here, the dispute centers upon whether the District is residential for purposes of § 209; an issue not raised or discussed in *Merlin Myers*.  Moreover, the statutes in the two cases differ considerably.  In *Merlin Myers*, we considered the pre-2005 version of § 209, which simply stated that gravel mining in residential areas could be subject to county zoning regulations, while gravel mining in non-residential areas could not.  *Merlin Myers*, ¶¶ 15-16.  The controlling version of § 209 in the case at bar subjects all gravel operations to zoning regulations, but gives counties the authority to actually prohibit gravel operations "within a geographic area zoned as residential, as defined by the board

44

of county commissioners." Section 76-2-209(2), MCA. The current version of § 209 clearly instructs boards and reviewing courts to look to the definitions given by the boards of county commissioners in making the threshold determination as to whether a geographic area is zoned residential.

¶86 Although we agree with Tutvedt that the Board never made a specific determination that the District was "residential," we affirm the District Court's grant of summary judgment in this case because an explicit finding on this matter by the Board was not required as a matter of law. In fact, a determination by the Board one way or the other on this issue was immaterial, because under the plain language of the statute, only the definition given to the zoning district by the Commissioners is dispositive.

¶87 We decline Tutvedt's invitation to read § 209(2) in a manner requiring an area be zoned "Residential" with a capital "R" in order for § 209(2) to apply, as to do so would ignore the statute's directive to look primarily towards the definition given to a geographic area by the board of country commissioners. While there may be cases in which the definition given by the board of county commissioners is hard to discern, this is not one of them. The Regulations and the Plan speak for themselves in this case, and demonstrate convincingly that the District was defined as "residential" by the Commissioners, even though the District permits other uses. Accordingly, the authority of the Board falls within the § 209(2), and it may completely prohibit concrete and asphalt batching operations in the District.

¶88    Because we find that the Board had the authority to prohibit asphalt and concrete batch plant operations, we do not reach Citizens' argument that § 76-2-209, MCA, is unconstitutional as applied in this case.

## CONCLUSION

¶89    For the foregoing reasons, we affirm the District Court's conclusion that the Board had the power to prohibit asphalt and concrete batch plant operations under § 76-2-209, MCA.   We reverse the District Court's conclusion that the Board did not abuse its discretion in issuing the CUP, and remand this case to the District Court for further proceedings consistent with this opinion.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE