FILED

06/20/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0438

DA 22-0438

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2023 MT 119

HAMILTON SOUTHSIDE HISTORIC
PRESERVATION ASSOCIATION,

        Petitioner and Appellant,

    v.

ZONING BOARD of ADJUSTMENT
of the CITY of HAMILTON,

        Respondent and Appellee,

    and

ROMAN CATHOLIC BISHOP of HELENA,
a religious corporation sole,

        Respondent and Appellee.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
                    In and For the County of Ravalli, Cause No. DV-21-299
                    Honorable Jennifer B. Lint, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Roy H. Andes, Attorney at Law, Missoula, Montana

        For Appellee Roman Catholic Bishop of Helena:

                Michael D. Montgomery, Montgomery Law Offices, Hamilton, Montana

                William P. Driscoll, Franz & Driscoll, PLLP, Helena, Montana

        For Appellee Zoning Board of Adjustment:

                Karen S. Mahar, Hamilton City Attorney, Hamilton, Montana

Submitted on Briefs:  March 22, 2023

Decided:  June 20, 2023

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Hamilton Southside Historic Preservation Association (HSHPA) appeals from the June 14, 2022 Opinion and Order Re: Writ of Certiorari issued by the Twenty-First Judicial District Court, Ravalli County, denying HSHPA's Verified Petition for Writ of Certiorari, filed in that court on August 9, 2021. The petition challenged four decisions of the Hamilton Zoning Board of Adjustment (ZBA): (1) granting conditional use permit (CUP) #2019-06 to the Roman Catholic Bishop of Helena (Bishop) to construct and use a new church structure after demolition of the current St. Francis Catholic Church, (2) granting the Bishop Variance #2019-05, that allows a rear-yard setback variance, (3) granting the Bishop Variance #2019-02, that allows a steeple height variance, and (4) affirming the ZBA's approval of a decision of the Zoning Administrator of a joint use parking agreement (JUPA) for the new structure.

¶2 We restate the issues on appeal:

*1. Whether the District Court erred in determining the ZBA did not abuse its discretion when it issued CUP #2019-06 approving demolition of the current structure and construction of a new church facility.*

*2. Whether the District Court erred in determining the ZBA did not abuse its discretion when it issued CUP #2019-06, Variance #2019-05, approving a rear-yard setback variance.*

*3. Whether the District Court erred in determining the ZBA did not abuse its discretion when it issued CUP #2019-06, Variance #2019-02, approving a steeple height variance.*

*4. Whether the District Court erred in determining the ZBA did not abuse its discretion when it upheld the Zoning Administrator's approval of the JUPA.*

¶3 We affirm the District Court.

3

**FACTUAL AND PROCEDURAL BACKGROUND**

¶4      In October 2018, the Bishop applied to the City of Hamilton (City) through the ZBA for a CUP and variances.  The Bishop sought to demolish the current church structure,[1] built in 1897, and build a larger, ADA accessible church building in its place.  In November 2018, the City's then Zoning Administrator issued a report that recommended the ZBA approve the CUP.  A public hearing regarding the CUP request was held November 26, 2018, at which public comment was received.  At the conclusion of the hearing, the ZBA approved the Bishop's CUP and all requested variances and issued a record of decision on December 26, 2018.

¶5      Thereafter, various neighbors of the Church and City residents brought suit against the ZBA in *Roddy, et al. v. ZBA*, Ravalli County Cause No. DV 19-30, appealing the ZBA's approval of the Bishop's CUP and variances.  In turn, the City agreed to vacate all the zoning permits issued by the ZBA in relation to the Bishop's CUP and remand the matter to the ZBA for reconsideration and, in the interim, to enjoin demolition of the current structure or construction of the new church.

¶6      On July 23, 2019, the Bishop submitted a new CUP application that is the subject of the present appeal.  In this application, designated CUP #2019-06, the Bishop sought a

---

[1] The Bishop owns the entire block upon which the current structure is located.  The property consists of a three-building complex that includes St. Francis Catholic Church, the Parish Center, a school building generally known as the "MAPS building," and a parking lot that serves the complex.  The Parish Center was built in 2008 pursuant to approval of a CUP.  That CUP required the Bishop provide 65 off-street parking spaces and to demolish the MAPS building.  The Bishop has yet to provide the additional 65 parking spaces and has not demolished the MAPS building but instead converted it to a commercially rented school facility.  Although none of these zoning violations has been enforced or penalized, they are not at issue in this appeal.

permit to rebuild St. Francis Catholic Church—after the current structure is demolished—plus three variances asking to be excused from setback, height, and parking requirements of the City's zoning code. The Bishop's proposed CUP sought to essentially double the church's physical footprint and nearly double its current seating capacity. The Bishop also sought a variance from setback requirements, a variance to allow the steeple to exceed the maximum church height, and a variance to allow on-street parking to count as off-street parking to meet minimum parking requirements.

¶7 On November 29, 2019, the City's Public Works Department submitted staff reports to the ZBA for the proposed CUP and each requested variance. Each Staff Report included findings of fact and each respectively recommended approval of the revised CUP and each requested variance. Also on November 29, 2019, the ZBA mailed a Notice of Public Hearing on CUP request #2019-06 to all property owners within 300 feet of the exterior boundaries of the area to be occupied by the proposed use. Notice of the public hearing, scheduled for December 16, 2019, was also published in the *Ravalli Republic* newspaper on December 1, 2019, and December 8, 2019, as well as posted at the City Hall and City of Hamilton Public Works Building.

¶8 Due to high attendance at the December 16, 2019 public meeting, it was adjourned and scheduled to be reconvened on January 13, 2020. On that date, to accommodate public comment, it was necessary to adjourn the meeting and reconvene it on January 30, 2020. Due to the COVID-19 pandemic, continuation of the in-person hearing was not possible, and continuation of the public hearing was held via Zoom on October 5, 2020, November 4,

5

2020, November 9, 2020[2], December 2, 2020, January 21, 2021, March 8, 2021, and June 14, 2021. The public meeting ultimately lasted 19.5[3] hours and was attended by at least 296 members of the public. The ZBA's record contains over 700 pages comprised of the CUP application and variance requests; architectural and site plans and narratives; notices; written public comment; multiple exhibits; Public Works staff reports with attached exhibits; Title 17 of the Hamilton Montana Code of Ordinances (HMC); neighbors' exhibits; proposed and final JUPAs; the Traffic Impact Study and Parking Review by the WGM Group (WGM), an engineering, planning, and design firm; site plans; meeting minutes; historical information about the Church; prior CUPs and zoning resolutions related to the Bishop; a petition opposing demolition of the current structure; questions by neighbors' attorney and Public Works' response thereto; and the Records of Decisions issued by the ZBA. At the conclusion of the public hearing, the ZBA approved the Bishop's project with an amended CUP, two variances, and the JUPA.[4] On July 12, 2021, the ZBA Chair signed CUP #2019-06, approving the construction of the new church and the JUPA; Variance #2019-05, approving the rear-yard setback variance; and Variance #2019-02, approving the steeple height variance. In so doing, it adopted, with minor

_____

[2] On November 9, 2020, the ZBA voted to approve the CUP and the setback and steeple height variances but thereafter continued to hold the public hearing on the CUP through June 14, 2021.

[3] The parties assert varying lengths for the hearing over the hearing's 18-month period. The City's Zoning Administrator, charged with maintaining the official records of the ZBA, attests the hearing to have been 19.5 hours in length.

[4] Upon the approval of the JUPA, Variance #2019-06 related to parking was formally withdrawn.

6

changes, the entirety of the proposed findings contained within the November 29, 2019 Staff Reports.

¶9 On March 18, 2021, the HSHPA was organized and on August 9, 2021, it filed its Verified Petition for Writ of Certiorari in the District Court. Following review of the ZBA record and briefing by the parties, the District Court affirmed the ZBA's records of decision, denied HSHPA's Petition for Writ of Certiorari, and dissolved the injunction precluding further work on the project. This appeal followed.

**STANDARD OF REVIEW**

¶10 We review de novo appeals from a district court's grant of summary judgment. *Flathead Citizens for Quality Growth, Inc. v. Flathead Cty. Bd. of Adjustment*, 2008 MT 1, ¶ 31, 341 Mont. 1, 175 P.3d 282. "Section 76-2-227, MCA, authorizes the reviewing court to hold a hearing and reverse, affirm, or modify a decision made by a board of adjustment. A district court is thus bound to review a board of adjustment's decision for an abuse of discretion." *Flathead Citizens,* ¶ 32 (citation omitted). "To determine whether an abuse of discretion has occurred, we examine whether the information upon which the Board based its decision is so lacking in fact and foundation that it is clearly unreasonable and constitutes an abuse of discretion." *Flathead Citizens*, ¶ 32 (citation and internal quotation omitted). Courts give deference to the decisions of local boards. *Town and Country Foods, Inc. v. City of Bozeman*, 2009 MT 72, ¶ 14, 349 Mont. 453, 203 P.3d 1283. "[A] court will not substitute a judicial discretion for the discretion of [a] board or body acting within the scope of [] its exclusive authority." *Freeman v. Bd. of Adjustment*, 97 Mont. 342, 357, 34 P.2d 534, 539 (1934).

7

## DISCUSSION

¶11 At the outset we note that, although HSHPA did not assert a specific due process claim in its Issues on appeal, it asserts the hearing process was "functionally chaotic." In asserting the ZBA's findings were not supported by competent and substantial evidence, HSHPA argues that the hearing process should have been more akin to a contested hearing before a judge—suggesting that due process requires subpoenaing witnesses, administering oaths, and presenting and cross-examining both lay and expert witnesses. HSHPA further implies that a zoning board conducting such hearing must have specialized training to evaluate evidence on the bases of relevance, hearsay, speculation, and foundation. While HSHPA indicates an understanding that we have never imposed formal rules of evidence to zoning hearings, it appears to advocate for the requirement of such.

¶12 Although § 2-3-111(1), MCA, requires that the public be provided the opportunity to be heard by a zoning board by "affording interested persons reasonable opportunity to submit data, views, or arguments, orally or in written form, prior to making a final decision that is of significant interest to the public[,]" it does not require their data, views, or arguments be taken under oath. Article II, Section 8, of the Montana Constitution provides that the public has the right to expect governmental agencies to afford reasonable opportunity for citizen participation, and § 2-3-101, MCA, requires the establishment of guidelines to secure the right to be afforded reasonable opportunity to participate in the operation of governmental agencies prior to the final decision of the agency. Neither requires that such participation must take a form similar to a court hearing. As the Montana Administrative Procedure Act does not apply to units of local government such as the ZBA,

8

§ 2-4-102(2)(b), MCA, formal rules of evidence do not apply to administrative hearings conducted by the ZBA. As accurately noted by the District Court:

> The Montana Supreme Court has stated that when a government agency "complied with its own rules, gave notice and provided an extended opportunity to submit information, permitting . . . interested persons to submit voluminous materials, offer oral opinions and statements, make objections and provide written arguments prior to the rendering of a final decision," the agency's "method of affording public participation, § 2-3-111(1), MCA, was fundamentally fair and provided a reasonable opportunity for citizen participation as required by Article II, Section 8 of the Montana Constitution." *Bitterroot River Protective Ass'n v. Bitterroot Conservation Dist.*, 2008 MT 377, ¶ 26, 346 Mont. 507, 198 P.3d 219.

Here, the ZBA complied with its own rules, gave notice, and provided extended opportunity over an 18-month period for interested persons to submit voluminous materials, offer oral opinions and statements, ask questions, make objections, and provide written arguments prior to making its final decision. The ZBA's hearing provided a fundamentally fair process and reasonable opportunity for citizen participation. It is within this framework that we consider the issues raised by HSHPA.

¶13     HSHPA asserts the District Court failed to discuss any statutes or standards therein and, without analysis, concluded that the ZBA regularly pursued its authority, did not exceed its jurisdiction, and did not abuse its discretion in issuing the CUP #2019-06 or in approving the JUPA. HSHPA points out that the City's zoning code imposes four main requirements with regard to a conditional use structure: (1) it must be "in harmony with the principal uses of the district" (HMC 17.04.040); (2) it must be "appropriate and in the best interests of the public" (HMC 17.08.050(B)(1) and 17.124.020(B)(1)); (3) it must not be detrimental to the "health, safety, comfort and general welfare of persons residing or

9

working within the community" (HMC 17.124.030(A) and 17.124.040(B)(2)); and (4) it must be consistent with the intent of Title 17 (HMC 17.124.040(B)(1)—designed in accordance with the growth policy). HSHPA asserts the District Court failed to consider evidence of the ZBA's abuses of discretion, to cite any City zoning ordinance, and to consider whether the ZBA's findings were supported by competent and substantial evidence or whether they followed the law.

¶14 Contrarily, the ZBA and Bishop contend the ZBA pursued its authority regularly; did not exceed its jurisdiction; reviewed information from City staff, neighbors, the public, and traffic engineering experts; deliberated appropriately; made decisions consistent with City zoning codes; and did not abuse its discretion in issuing CUP #2019-06 or in approving the JUPA.

¶15 The ZBA's powers are set forth in § 76-2-323, MCA. It is bound to apply the City's zoning regulations. Section 76-2-307, MCA. It cannot disregard zoning provisions or exceed the powers conferred by zoning codes and must act in accordance with the law. *Flathead Citizens*, ¶ 37. It has the power "to hear and decide special exceptions" to the terms of the zoning code. Section 76-2-323(1)(b), MCA. There is, however, no requirement for the ZBA to "explain in detail why it has determined each criterion is or is not met, and precisely what facts it found most convincing." *Lake Cty. First v. Polson City Council*, 2009 MT 322, ¶ 34, 352 Mont. 489, 218 P.3d 816. It is a general principle of administrative law that the record developed by an agency serves to flesh out the pertinent facts upon which a decision is based in order to facilitate judicial review. The record made before a board of adjustment is essential to an enlightened determination of its action by a

10

governing body or by a court on review. *Flathead Citizens*, ¶ 47 (citations and quotations omitted).

¶16 The parties do not dispute the record before the ZBA, but rather dispute whether the information upon which the ZBA based its decision was so lacking in fact and foundation that it was clearly unreasonable, arbitrary, or capricious and thus an abuse of discretion.

¶17 *1. Whether the District Court erred in determining the ZBA did not abuse its discretion when it issued CUP #2019-06 approving demolition of the current structure and construction of a new church facility.*

¶18 Although the District Court's findings of fact could have been more thorough, from our review of the record, we conclude the court did not err in determining the ZBA did not abuse its discretion when it issued CUP #2019-06. In a review process similar to that approved in *North 93 Neighbors, Inc. v. Bd. of Cty. Comm'rs*, 2006 MT 132, 332 Mont. 327, 137 P.3d 557, the ZBA considered the application, the Zoning Administrator's recommendations, and staff input; published notice and received and considered public comment; considered the traffic study and parking review of WGM; discussed the pros and cons of the application; obtained an attestation from each board member that each considered all of the information in its record; and approved the CUP upon vote of the board. It adopted the findings set forth in the Staff Report with some changes. In sum, the ZBA "followed the proper statutory and regulatory procedure" for reviewing a CUP and "had sufficient evidence before it to make an informed decision." *Lake Cty. First*, ¶ 34 (quoting *North 93 Neighbors*, ¶ 44).

¶19 The parties agree HMC 17.124 of the City's zoning regulations govern the Bishop's application for a CUP. Specifically, HMC 17.124.040(B) provides in pertinent part:

11

A conditional use permit or conditional use structure permit may be granted when allowed in the district, provided:
1. It is consistent with the intent of this Title 17; [and]
2. The use or structure is not detrimental to the health, safety, comfort and general welfare of persons residing or working in the neighborhood or the general welfare of the city[.]

¶20 A "conditional use" or "conditional use structure" is one that is not permitted by right, but one allowed upon findings by the ZBA that it is in harmony with the principal uses of the zoning district. HMC 17.04.040.

¶21 The Staff Report that reviews and analyzes the Bishop's CUP application provides detailed findings of fact and staff analysis as to how those facts satisfied requirements of pertinent City zoning codes,[5] and includes six attached exhibits detailing public comment received from neighbors, a vicinity map, HMC 17.124, and the Stipulation resultant from the Bishop's 2018 CUP application detailing ZBA's requirement to address particular zoning codes contained in HMC 17.124. The Staff Report recommends the ZBA approve the CUP with conditions.[6] Each member of the ZBA repeatedly averred s/he had received

---

[5] The Report specifically finds the proposed conditional use structure to meet the individual Purpose and Intent criteria of HMC 17.04.030, analyzing each subsection requirement of (A)(1)-(12) and (B)(1)-(8); to not be detrimental to the health, safety, comfort and general welfare of persons residing or working in the neighborhood or community, or the general welfare of the City analyzing compliance with HMC 17.124.030(A) and 17.124.040(B)(2); to be able to address parking issues through an agreement for joint use of off-street parking facilities under HMC 17.100.110 or variance under HMC 17.124; and to be consistent with the intent of Title 17. Like the District Court, we do not restate the numerous findings and analysis set forth in that eight-page report.

[6] These conditions included: providing adequate off-street parking through either a joint use agreement or variance; curb, gutter, and storm water facilities designed with ADA compliance to accomplish the on-street angle parking proposed; obtaining proper approval or permits for demolition and construction; obtaining construction plans for all site improvement; installing construction site fencing and dust and sound mitigation; complying with safety regulations; and

12

and relied upon this Staff Report, its attachments, public comment, and ZBA's record in determining whether to approve the CUP.

¶22 Public hearing on the CUP commenced December 16, 2019, and was conducted January 13, 2020, January 30, 2020, October 5, 2020, November 4, 2020, and November 9, 2020. On November 9, 2020, the ZBA voted to approve and adopt the Staff Report findings and approve CUP #2019-06 subject to the conditions noted in that Staff Report. HSHPA asserts that it was inappropriate for the ZBA to approve and adopt those findings as they were prepared nearly a year prior, before the ZBA commenced hearing on the CUP. HSHPA asserts the ZBA failed to properly analyze and reconcile the objective of the City's Growth Policy in light of neighbors' exhibits and public comment. Over the course of the public hearing, the ZBA received public comment both for and against the proposed CUP as well as written materials from various neighbors and the larger public. Each ZBA member attested that in determining whether to and under what conditions to approve the subject CUP, s/he considered all written materials and public comment made at hearing or submitted. The Staff Report no doubt assisted ZBA members in contextualizing and evaluating this evidence to determine if any of the concerns or issues raised through the hearing process overcame the Staff Report's findings and analysis. Upon completing the serial hearing process on June 14, 2021, the additional concerns and issues raised did not alter the ZBA's approval of the subject CUP. From our review of the record, the

agreeing in writing that repair of any improvement within the alley right-of-way shall be the responsibility of the Bishop.

13

information upon which the Board based its decision was not so lacking in fact and foundation that it was clearly unreasonable. Thus, we conclude the ZBA did not abuse its discretion in approving CUP #2019-06 subject to particular conditions.

¶23   *2. Whether the District Court erred in determining the ZBA did not abuse its discretion when it issued CUP #2019-06, Variance #2019-05, approving a rear-yard setback variance.*

¶24   Again, although the District Court's findings of fact could have been more thorough, from our review of the record, we conclude the District Court did not err in determining the ZBA did not abuse its discretion when it approved CUP #2019-06, Variance #2019-05. Variance #2019-05 requested a rear-yard setback variance of two feet, rather than the 20 feet required by HMC 17.24.050(C)(2). As part of its appropriate review process, the City's Public Works Department likewise reviewed and analyzed the requested variance. Staff concluded:

> Zoning setbacks are established to provide adequate light and air; to secure safety from fire, panic and other dangers; and to maintain neighborhood aesthetics and character. Setbacks in building code are also in place to protect life, health, and safety. In this particular case, approving a variance for a two (2) foot rear yard setback will not be detrimental to any of these concerns.

Staff supported this conclusion with their reasoning: the 20' right-of-way running north/south will be retained by the City and expanded by a grant of additional easement to the west; no buildings were proposed on the west side of the City right-of-way; the proposed setback variance allows the front yard setback of 20' to be maintained, preserving the existing character of the neighborhood; other zoning districts in the City allow zero-foot rear setbacks; allowing a two-foot rear setback would not be detrimental to any adjoining

14

properties and would be in accordance with similar uses in similar neighborhoods; a 20' rear setback for a church building that is part of a single ownership Church Campus is not necessary; and the proposed two-foot rear-yard setback would still provide adequate space to maintain the utilities in the alley and provide adequate separation between buildings or structures per the 2012 International Building Code. Staff further concluded that the proposed variance with the condition of an additional easement met the provisions of HMC 17.04.030(A)(3), (5), (6), and (8) and 17.124.050(B), finding such will: secure safety from fire and other danger on the premises; facilitate the adequate provision of transportation, water, sewage, and other such public requirements; improve the quality of the physical environment of the community by improving access to the church and parking area; and provide for a larger church while still maintaining the consistent historical appearance of the neighborhood, without detrimental impact on surrounding properties or the community as the alley will remain available to provide safe vehicular and pedestrian access. Staff also considered whether the requested variance was necessary to avoid hardship created by strict application of City zoning codes. In this regard, staff concluded that a special circumstance existed in that the Bishop owned the entire block, including the adjacent lot to the west that would be impacted by the variance. Typically, these lots could be aggregated to avoid the need for the variance while still permitting the proposed construction, but in this instance, existing service lines in the alleyway precluded aggregation. Strict application of zoning setback requirements deprived the Bishop of rights commonly enjoyed by other landowners who have been permitted to aggregate lots under single ownership as well as encroach into City rights-of-way with approved

15

permitting. Finally, staff concluded the variance "will be in harmony with the general purpose and intent of HMC Chapter 17.124 in that it will not detrimentally affect the health, safety, comfort and general welfare of persons residing or working within the community under HMC 17.124.030(A)," and recommended that the ZBA adopt the findings presented in the Staff Report and approve Variance #2019-05 as applied for with conditions.[7]

¶25    On November 9, 2020, the ZBA voted to approve and adopt the findings contained in the Staff Report and approve Variance #2019-05 subject to the conditions noted in the Staff Report. HSHPA again asserts that it was inappropriate for the ZBA to approve and adopt the findings from proposals written long before most of the evidence was received, but we remain unpersuaded by this argument. Upon receiving a formal variance request, the City's Public Works Department was required to review and analyze it—rather than wait to analyze it after a zoning board hearing and the taking of public comment. In accordance with this obligation, staff set forth findings of fact and analyzed the facts to determine whether the City's zoning codes were satisfied and approval of the variance was warranted.

¶26    The Staff Report's findings and analysis with regard to Variance #2019-05 no doubt assisted ZBA members in contextualizing and evaluating the public comment and

---

[7] These conditions included: the Bishop obtaining approval of the CUP #2019-06 and complying therewith; the Bishop granting the City a public access and utility easement aligning with the new driveway running north/south through the property to provide unencumbered alley access in addition to retaining the existing City right-of-way to protect the sewer main and other utilities currently located there; obtaining proper approval or permits for demolition and construction; obtaining construction plans for all site improvements; installing construction site fencing and dust and sound mitigation; complying with safety regulations; and agreeing in writing that repair of any improvement within the alley right-of-way shall be the responsibility of the Bishop.

16

additional written material submitted through the public hearing process to determine if any of the concerns or issues raised through the hearing process overcame the staff's findings and analysis. Upon completing the hearing process on June 14, 2021, the additional concerns or issues raised did not alter the ZBA's approval of the variance. While contrary information and recommendations were presented to and considered by the ZBA, it was free to determine the information within the Staff Report was more credible and reliable than any contrary evidence or analysis presented. From our review of the record, the information upon which the ZBA based its decision was not so lacking in fact and foundation that it was clearly unreasonable. Thus, the ZBA did not abuse its discretion in approving Variance #2019-05, permitting the requested rear-yard setback subject to particular conditions.

¶27　*3. Whether the District Court erred in determining the ZBA did not abuse its discretion when it issued CUP #2019-06, Variance #2019-02, approving a steeple height variance.*

¶28　Again, although the District Court's findings of fact could have been more thorough, from our review of the record, we conclude the District Court did not err in determining the ZBA did not abuse its discretion when it approved CUP #2019-06, Variance #2019-02. Variance #2019-02 requested a variance for the steeple height of nine feet, eight inches with an additional five feet for an ornamental crucifix to sit atop the steeple, for a total height of 14 feet, eight inches above the 45-foot maximum height allowance required by HMC 17.24.060(C).

¶29　Upon receiving this variance request, the City's Public Works Department undertook normal review and analysis of the request and issued its Staff Report

recommending adoption of the findings presented in the report and approval of the variance with specific conditions.[8] Staff reasoned that the request conformed with the intent of Title 17 because it conforms with the character of the district under HMC 17.04.030(A)(9); conserves some of the value of the existing building under HMC 17.04.030(A)(11); maintains the historical appearance for the surrounding neighborhood under HMC 17.04.030(B)(6); and is generally consistent with the intent of the single-family residential district use along with some conditional uses such as churches under HMC 17.24. Staff found the proposed use of the historic steeple preserves a particular architectural type of historical context consistent with the City's Growth Policy Land Use Section. The proposed steeple would be five feet lower than the steeple on the current structure and consistent with similar uses in similar neighborhoods as there are three other churches in residential zoning districts in the City that have steeples exceeding the 45-foot height limit. Considering this, denial of this variance would cause a hardship to the Bishop's property as it would be denied privileges enjoyed by other similar properties in similar zoning areas and the variance will not detrimentally affect "the health, safety, comfort and general welfare of persons residing or working within the community" under HMC 17.124.030(A).

¶30 Again, ZBA members attested to receiving and considering not only the staff recommendation but other material submitted through the application and hearing process

---

[8] These conditions included: the Bishop obtaining approval of the CUP #2019-06 and complying therewith; the Bishop maintaining minimum requirements for insurance and bonding for construction; obtaining proper approval or permits for demolition and construction; obtaining construction plans for all site improvement; installing construction site fencing and dust and sound mitigation; and complying with safety regulations.

and the public comment received when they voted to adopt the findings set forth in the staff report and approve Variance #2019-02. Again, although the staff report regarding Variance #2019-02 was prepared prior to receiving other information or public comment, this does not negate the Staff Report's findings, analysis, and recommendations. The Staff Report assisted ZBA members in contextualizing and evaluating the public comment and additional written material submitted through the public hearing process to determine if any of the concerns or issues raised through the hearing process overcame the staff's findings and analysis. Again, from our review of the record, the information upon which the ZBA based its decision was not so lacking in fact and foundation that it was clearly unreasonable; thus, the ZBA did not abuse its discretion in approving Variance #2019-02 permitting a steeple height variance subject to specific conditions.

¶31 *4. Whether the District Court erred in determining the ZBA did not abuse its discretion when it upheld the Zoning Administrator's approval of the JUPA.*

¶32 Despite the other issues raised by HSHPA, congestion issues—namely parking issues—appear to be the driving force behind the parties' dispute. With the increased church size and capacity, neighbors are concerned there will be insufficient parking such that individuals using the complex for worship, school, and special events will park in the surrounding neighborhood in a fashion that will interfere with homeowners' use of their properties. In conjunction with the CUP #2019-06 application, the Bishop also submitted Variance #2019-06 seeking an allowance of on-street parking to be counted as part of the off-street parking requirements for the three-building complex. The City's Public Works Department reviewed this variance request and issued a Staff Report recommending denial

19

of the variance. It recommended "further analysis of the need for parking to determine whether an agreement for joint use of off-street parking facilities under HMC 17.100.110 would be sufficient to address parking needs for [the complex], making a variance [for] parking unnecessary." Staff advised that under HMC 17.100.070(N), (U), and (V), 200 off-street parking spaces would be required for the complex—97 for the church, 61 for the Parish Center, and 42 for the MAPS building. The Church asserted it was able to provide 65 off-street and 68 on-street parking spaces for a total of 133 parking spaces. The variance request sought to decrease the 200-parking space requirement by 67 spaces and to then allow 68 of the 133 remaining spaces to be provided on-street with improvements. Staff noted primary concern that the proposed 133 parking spaces may not provide an adequate number of spaces at busy times, impeding access for emergency vehicles and convenient and safe access to property in general. While improvements proposed to both the on- and off-street parking would greatly improve the aesthetics and flow of traffic at the complex, the reduced number of spaces proposed may not sufficiently alleviate hazards with access to neighborhood traffic generating businesses and uses, provide adequate and safe parking for the complex without impacting parking for residents in the district, and protect adjacent residential uses from undesirable effects of increased traffic. Staff indicated joint use of off-street parking facilities to be more appropriate than a variance reducing the required spaces. In its analysis, staff noted that some variance from the strict application of off-street parking requirements would be in the public interest in consideration of the actual uses of the complex—many MAPS building students do not drive to the building and that building does not operate on weekends when the church is busiest, and use of the Parish

20

Center occurs mostly in conjunction with special church and community events. Each building is not used on a consistent, daily basis; whereas consistent, daily use is assumed when calculating required parking spaces under the City's zoning code. Staff concluded that strict application of the off-street parking requirements would unreasonably cause hardship to the property given how the complex is typically used, but the variance as proposed "could detrimentally affect the health, safety, comfort and general welfare of persons residing or working within the community under HMC 17.124.030(A)."

¶33    Subsequently, the staff prepared an Addendum to its Staff Report regarding Variance #2019-06. The Addendum provides that, following receipt of public comment on December 16, 2019, January 13, 2020, and January 23, 2020, the Zoning Administrator re-evaluated the off-street parking requirements and concluded the number of required off-street parking spaces for all uses of the complex is 161, not 200 as originally calculated. The Addendum sets forth the revised calculations, the factors affecting the revised calculations, and the options for meeting the revised requirements—variance request, a joint use off-street parking agreement, removal of the MAPS building, or obtainment of additional details on parking utilization and traffic circulation patterns.

¶34    Subsequent to the staff recommendation to deny Variance #2019-06, with the approval of the City's Zoning Administrator, St. Francis of Assisi Parish and the Bishop submitted a proposed agreement to provide for the collective use of off-street parking of the complex—the JUPA. Pursuant to the JUPA, the Church, the Parish Center, and the MAPS building agree to building usage to limit conflicts such that the maximum parking spaces required would not be needed for all three buildings at the same time. Specifically,

21

they would ensure that significant overlapping use—defined as when the Church and the Parish Center are utilized for a short time by over 60% of each building's calculated parking capacity—shall be limited to less than one percent of the calendar year.

¶35　An additional Addendum to the Staff Report, issued January 8, 2021, again recommended denying the requested Variance #2019-06 and also recommended denying of the proposed JUPA. The Addendum asserted the JUPA did not provide sufficient off-street parking for the use requiring the most parking because there were conflicts in the principal operating hours of the Church and the Parish Center, and the JUPA set forth inaccurate figures for the required number of parking spaces and provided insufficient measures to mitigate potential detrimental impacts to the neighborhood in the long term. In response to the Addendum, revisions were made to revise the Church's seating plan for less occupancy, increase the on-site parking spaces from 65 to 76, and modify the operating hours of the Church, the Parish Center, and the MAPS building to avoid use conflict. The proposed JUPA was revised accordingly and resubmitted to the City's Zoning Administrator for consideration pursuant to the requirements of HMC 17.100.070 and 17.100.110.[9] On February 12, 2021, a new Addendum to the Staff Report recommended approval of the proposed revised JUPA with condition.[10] The February 12, 2021

---

[9] HMC 17.100.110(A) allows for the "owner(s) of a group of uses or buildings [to] jointly provide for the collective use of off-street parking and loading spaces, subject to the zoning administrator's approval of the plans therefore." Furthermore, HMC 17.100.110(E) provides, "It shall be the applicant's responsibility to establish that there is no substantial conflict in the principal operating hours of the buildings or uses for which the joint use of the parking facility is proposed."

[10] The recommended approval was conditioned upon providing a revised site plan showing sufficient space for the City's fire and jet trucks.

Addendum outlines the analysis and rationale of the Public Works Department's recommendation.[11]

¶36    In April 2021, the City retained WGM—a planning, engineering, and design firm that had been working with the City since 2013 on design improvements to Ravalli Street including the block adjacent to the Church—to conduct a parking review of the Bishop's design, and a traffic study relating to the proposed Church expansion.  WGM's parking review assessed impacts to the surrounding neighborhood and considered whether the proposed JUPA and parking layout provided for safety concerns.  WGM's traffic study addressed whether the proposed use and parking layout created congestion above levels which could reasonably be expected in a mixed-use residential neighborhood and which may be considered unsafe or detrimental to the neighborhood.  WGM issued its parking review and traffic impact study on May 14, 2021.  After reviewing WGM's reports, the City Public Works Department issued another Addendum to its Staff Report that reaffirmed its prior approval of the proposed JUPA, again setting forth its detailed analysis and key findings upon which it based its recommendations.[12]    Having considered all public

---

[11] The Church and Parish Center are complimentary uses which rarely receive peak usage at the same time and their peak usage does not conflict with use of the MAPS building; there is no regular, substantial conflict in principal operating hours of the complex; requiring parking based on special events would result in oversupply inconsistent with the City's Growth Policy; improvements to the current parking lot and adjacent streets will improve safety and access above current conditions; and the JUPA provides the 76 off-street parking spaces shall remain in place.

[12] Similar to the District Court, it is not necessary for us to repeat the extensive analysis and rationale contained in the June 7, 2021 Addendum to Staff Report but to determine "whether the information upon which the Board based its decision is so lacking in fact and foundation that it is clearly unreasonable and constitutes an abuse of discretion." *Flathead Citizens*, ¶ 32 (citation omitted).

comment along with the parking and traffic reviews of WGM, the ZBA unanimously affirmed the Zoning Administrator's approval of the proposed JUPA and Variance # 2019-06 was withdrawn.

¶37 Again, although the District Court's findings of fact could have been more thorough, from our review of the record, we conclude the District Court did not err in determining the ZBA did not abuse its discretion regarding approval of the JUPA. The ZBA had discretion to accept WGM's parking review and traffic study and to accept and adopt the analysis and rationale of Public Works staff and the Zoning Administrator as more credible than other information it received related to the parking issues. The District Court correctly concluded the ZBA did not abuse its discretion because its approval of the JUPA was based on competent and substantial information in its record.

¶38 HSHPA also asserts the JUPA is so vague it may not be an agreement at all, asserting its terms are insufficient to create a binding set of promises and it provides no enforcement mechanism. The City counters that the JUPA is a binding agreement providing the essential elements of a contract—identifiable parties capable of contracting, their consent, a lawful object, and consideration. We agree with the City. The JUPA identifies the parties—St. Francis of Assisi Parish comprising the complex and the Bishop. Its lawful object is to provide for the collective use of off-street parking in accordance with HMC 17.100.110. The consideration between the parties is their joint interest in meeting the requirements of the CUP to construct the new church by agreeing to share their off-street parking—each giving up or reducing the use of their facilities at particular times to jointly meet the City's parking requirements—and requiring construction and

24

maintenance of 76 off-street parking spaces in addition to requiring that the agreement cannot be terminated without authorization of the Zoning Administrator. Although the JUPA does not contain the breadth or specificity that HSHPA desires, it meets the requirements of an enforceable contract.

## CONCLUSION

¶39 In sum, HSHPA seeks that we reweigh the evidentiary record to give greater credence to the information and analysis advanced by those contesting approval of the subject CUP, variances, and JUPA. We decline to do so. We recognize this matter is of great interest to the City's residents who feel strongly in their divergent views and, regardless of the outcome, some will be highly disappointed. The information upon which the ZBA based its decision was not so lacking in fact and foundation that it was clearly unreasonable. The District Court did not err in upholding the decisions of the ZBA in this case and is thus affirmed.

/S/ INGRID GUSTAFSON

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE